**KENYON LIMITED PARTNERSHIP, et al., Appellants,**

v.

**1372 KENYON STREET NORTHWEST TENANTS' ASSOCIATION, et al., Appellees.**

**Nos. 07–CV–291, 07–CV–292.**

District of Columbia Court of Appeals.

Argued April 30, 2008.
Decided Sept. 3, 2009.

---

Clifton M. Mount, Washington, for appellants.

Ann M. Mason, with whom Kent R. Morrison, Daniel A. Sasse, Michael L. Martinez, Jennifer R. Devery, and David W. O'Brien were on the brief, Washington, for appellees.

Before RUIZ, Associate Judge, and TERRY and FARRELL,* Senior Judges.

* Judge Farrell was an Associate Judge of the court at the time of argument. His status

RUIZ, Associate Judge:

This appeal stems from a contract dispute between a tenants' association and the investors who entered into partnership with the association in order to take advantage of special accelerated depreciation rules for investments in low income housing. We conclude that under the financing agreement between the association and the partnership, the association had a right to purchase the building at a price calculated in accordance with the terms of the agreement, and that the evidence supported the trial court's finding that it was solvent and thus capable of enforcing the right to do so. We, therefore, affirm the trial court's judgment setting the purchase price at $584,132 for "good, clear and marketable title," and declaring that the association is entitled to "specific performance of the purchase-and-sale agreement created" when the tenants' association exercised its option to purchase.

## I.

Appellants are Kenyon Limited Partnership and various entities controlled by appellant Andrew Namrow ("KLP").[1] Through his interest in these entities, Namrow owns 95.5% of an eighteen-unit apartment building located at 1372 Kenyon Street, Northwest. The members of the 1372 Kenyon Street, N.W., Tenants' Association (appellees) live in this building.

The tenants' association originally owned the apartment building, which provides low-income housing. On September 23, 1982, the tenants' association entered into a Transfer, Lease and Option Agreement ("TLOA") with various investors, including appellants Multiple and Phoenix, in order to obtain funds to rehabilitate the building.[2] The purpose of the agreement was to form a partnership, KLP, between the tenants' association and the investors. In exchange for the investors' capital contribution of approximately $400,000, the association transferred title to the property to KLP.[3] As a result, the investors, as partners of KLP, could derive a substantial tax benefit through accelerated depreciation on low-income properties that Section 167(k) of the Internal Revenue Code permitted at the time.[4] The partnership, in turn, was able to negotiate a purchase money mortgage on the property in the amount of $904,500 to complete the needed repairs on the building.

The tenants' association's expert, Gary Pokrant, explained that the purpose of section 167(k) was to encourage investment in

changed to Senior Judge on January 23, 2009.

1. In addition to KLP, the entities controlled by Namrow include Master Management, Inc., Multiple Housing, Inc. ("Multiple"), NRM Associates, Inc., and Phoenix Limited Partnership ("Phoenix").

2. Andrew Namrow, who is now the real party in interest, was not an original party to the TLOA. He testified, however, that he "was involved as the manager and as a financial advisor for the building ... from 1984...." He assumed the investors' interest in the TLOA—and, consequently, in the building— through a series of transactions "in the mid to late '90s."

3. Each partner agreed to make capital contributions, and partnership interests were distributed as follows:

| Partner | Capital | Interest |
| --- | --- | --- |
| Georgia Lloyd | $5 | 0.5% |
| Tenants' association | $5 | 0.5% |
| Multiple | $5 | 5% |
| Phoenix | $397,063 | 93.9% |
| Manny Holtz, Inc. | $1 | 0.1% |

4. The Internal Revenue Code specified that accelerated depreciation was allowed for "rehabilitation expenditures incurred with respect to low-income rental housing after July 24, 1969, and before January 1, 1987...." I.R.C. § 167(k)(1) (1982).

low-income rental housing by allowing investors to deduct the cost of the property's depreciation over a shortened sixty months instead of over its normal depreciable life.[5] *See* I.R.C. § 167(k)(1). In exchange for the tax benefit, the Internal Revenue Code limited the market appreciation that the investors may realize by capping the sale price of the property. As a primary purpose of the agreement, the TLOA anticipated this kind of sale to the tenants' association after the investors had taken the tax benefits as a primary purpose of the agreement. ("WHEREAS, the Association will have the option to purchase the Property at the end of the lease term at as advantageous a price as Section 167(k)(2)(B)(iii) of the Internal Revenue Code will allow.")

The parties specified the conditions and terms of such a sale. After title to the property transferred to KLP, the property was to be leased to the tenants' association for twenty years. Upon termination of the lease, the association had the option to purchase back the property. Paragraph 11 of the TLOA provides:

11. *Association's Option to Purchase*

A. The association shall have the right to purchase all of the Partnership's right, title and interest in the Leased Premises effective upon termination of this Lease at the end of its Term, in accordance with the following terms and conditions:

(1) The purchase price shall be One Million Five Hundred Thousand Dollars ($1,500,000), plus the amount of any outstanding deed of trust thereon, which amount the parties agree is a reasonable projection of the expected fair market value of the Property at that time, taking into account anticipated physical depreciation of the improvements as well as expectations regarding inflation and interest rates.

(2) The purchase price shall be payable in cash at settlement, except that the portion of the purchase price attributable to outstanding deeds of trust may be paid by the Association assuming the balance due thereon, if approved by the holders of the deeds of trust.

(3) Notice of intent to exercise the purchase option must be given not later than six (6) months prior to the end of the Term of the Lease.

(4) It is the belief of the parties that the transactions contemplated by this Lease are of the sort contemplated by Section 167(k)(2)(B) of the Internal Revenue Code, ... and that the transaction can meet the technical requirements of Section 167(k)(2)(B)(iii), depending upon the amount of the purchase price referred to in subparagraph (A)(1) above. Further, it is the desire and intent of the parties that the Association and the individual tenants of the Property obtain the advantage of the purchase price lower than that set forth in subparagraph (A)(1) above if, but only if, the Partnership is able to enjoy the benefits of Section 167 and of operating loss deductions with respect to the Property. Accordingly, and *notwithstanding the provisions of subparagraph (A)(1),* it is agreed that unless the Internal Revenue Service or a court of competent jurisdiction has ruled or held that the Partnership is not entitled to enjoy the benefits of Section 167 and of operating loss deductions with respect to the Property, *the purchase price referred to in subparagraph (A)(1) shall be reduced to the*

---

**5.** Pokrant testified that the accelerated depreciation allowed by section 167(k)(1) resulted in a "four-for-one tax shelter[: f]or every dollar you invested, you got $4 of tax deductions."

*highest price which will assure that the requirement of Section 167(k)(2)(B)(iii) are met.*

(emphasis added).

At some point after the advantageous tax provision had lapsed, Namrow offered to buy the investors' interest in KLP for $20,000, but he testified that, in the end, he paid nothing for it "[b]ecause at the settlement table, the [original partners] deemed that it wasn't worth $20,000." [6] Other than the 0.5% interest held by the tenants' association, Namrow "maintain[ed] that [he is now] the owner of Kenyon Limited Partnership." Namrow acknowledged that by the time he took over KLP, the investors had already taken all the allowable accelerated depreciation deductions,

and that he "knew what [he] was coming [into]." He claimed that he had not benefitted from the accelerated depreciation scheme.[7] The trial court found that after he acquired KLP, Namrow refinanced the purchase money mortgage for KLP in February 2004. Although he did not take out any cash from the deal, Namrow claims that he and his wife personally guaranteed the mortgage in order to obtain a lower interest rate.[8]

In August of 2004, at the end of the twenty-year lease term, the tenants' association notified Namrow that it would be exercising the option provided in the TLOA to purchase the property. Namrow rejected the association's offer to purchase.[9] The tenants' association filed suit

---

6. Namrow testified:

> My recollection is that the [original partners] were taking four-to-one write-offs up until 1985 when the tax law changed and those types of allowances went away. Now, the partners at the time ... [were] going out of business by the early '90s, and they wanted out of this deal. And they approached me and asked me [to buy them out]. . . .

7. Namrow, however, did not produce his tax returns during discovery.

8. Namrow's brief before this court represents that he refinanced $850,000, the principal amount then remaining on the original purchase money mortgage. Namrow did not testify that he personally guaranteed the mortgage along with his wife, and the record does not contain any documentation concerning Namrow's personal guarantee. The deed of trust for $850,000 executed in February 2004 is in the record, signed by Namrow as "general partner of" KLP. The original mortgage had a 12.5% interest rate, and Namrow refinanced it at 7%.

9. Neither the association's notice to Namrow nor Namrow's reply to the association is in the record. However, we do have a series of letters that Namrow sent to the tenants in 2002, before expiration of the lease term, ask-

ing them to move out of the building. In these Letters Namrow does not mention that the tenants' association had an option to purchase the building. In the first letter, dated March 1, 2002, Namrow wrote to the tenants:

> This letter is to notify you that I will not be renewing or extending the current Section 8 contract that currently provides rental assistance for all units in the building.
>
> . . . .
>
> **VERY IMPORTANT:** You will be contacted by the D.C. Housing Authority to become certified to obtain a *HOUSING CHOICE VOUCHER* for your family. . . . . When you obtain your voucher, you are not required to remain in the building. You may then take your voucher to any rental housing in the country ... and move to another apartment or house. . . .

In a subsequent notice, dated May 15, 2002, Namrow advised the tenants:

> General information regarding future of building:
> 1. Contract with Section 8 officially ends June of 2003. We are looking to relocate all residents by early 2003 (January o[r] February) so that no one gets stuck facing a time deadline.
>
> . . . .
>
> 4. Once you have your voucher, you may seek housing anywhere. . . .
> 5. [We] will work with each resident family to assist in the relocation process. As

for breach of contract in February 2005, requesting that the court uphold its right to purchase the property at the price of $584,132, pursuant to Paragraph 11(A)(4) of the TLOA. In February 2006, KLP filed its own suit, asking the trial court to declare that the tenants' association was insolvent. After the trial court consolidated the two cases, the parties cross-moved for partial summary judgment only on the issue of the association's right to purchase the property. In the order granting summary judgment to the tenants' association, the trial court ruled that the association had an option to purchase the property under Paragraph 11 of the TLOA. Noting that "[KLP had] not disputed the option price, only that the Association does not have an exercisable option," the court allowed KLP "10 days from this Order to make any submission or objection to the Association's assertion that the Option to Purchase is exercisable at $584,132." In response, KLP argued that "any purchase price" must include assumption of "any and all encumbrances."

In October 2006, the trial court held a trial, and determined that the purchase price of $584,132 set forth by the association was the amount called for by the TLOA.[10] The court again noted that Namrow "do[es] not dispute that, if a valid option exists, . . . [the cash purchase price is] $584,132. . . ." Namrow's sole contractual argument in the trial court, as on appeal, is that under the terms of the TLOA, to exercise the option to purchase, the association must not only pay the cash purchase price, but also must assume the $850,000 mortgage. As the trial court framed the issue, "[t]he essential controversy is whether the Association is entitled to purchase the Property at a certain set cash price or at the cash price plus payment or assumption of the existing mortgages and liens."

The trial court interpreted subparagraph 11(A)(4) of the TLOA, which sets forth the calculation of the purchase price by reference to section 167(k)(2)(B) of the Internal Revenue Code, as already subsuming any existing loans. According to the court:

> Under the express language of the TLOA, payment of the outstanding deeds of trusts was not deemed to be a separate obligation but deemed to be a "portion of the purchase price." The language could not be clearer that the

you know, rental housing in Columbia Heights, Mt. Pleasant, Adams Morgan, Petworth, etc. is scarce, so the sooner we start the process the easier it will be to find the housing you want.
. . . .
7. Once the building is vacant, we will begin the complete building renovation. We project that the renovation work will take a year–18 months. At this time, although plans are not yet finalized, it seems unlikely that residents will be able to return to the building once renovations have been completed.
8. Therefore, please look to your relocation to new housing with an eye towards it being long-term, rather than short-term. Of course, if you don't like where you move to, you can always move again. . . . .
. . . .

I have known most of you for many years. Its [sic] been a good long run. I wish you all the best in the future. . . . .
Sincerely,
/s/
Andrew S. Namrow

**10.** The association presented the expert testimony of Gary Pokrant, who, the court noted, "is an expert in tax, real estate, and financial planning." According to Pokrant, under the tax code provision referred to in the parties' agreement, I.R.C. § 167(k)(2)(B)(iii), the price could not exceed "the original cost of the property minus the tax benefits received by the taxpayer. . . . In addition[,] . . . that purchase price can also be increased by any taxable income from the property, itself, minus the tax that would have been incurred on that increase in taxable income."

"purchase price" consisted of payment of the cash *plus* payment or assumption of the deeds of trust. Thus, paragraph 11(4)'s provision that "the *purchase price* referred to in subparagraph (A)(1) shall be reduced" means [that] the total purchase price (cash *plus* deeds of trust) is reduced to the amount calculated under the depreciation formula.[11]

The court rejected the argument that the association was not "ready, willing, and able" to purchase the property, commenting that KLP's concern for the association's readiness was "ironic," because "[w]hen the Association has attempted to enforce its contractual rights, Defendants claim that the association is not willing or able to perform, without giving it any opportunity to perform under the contract."[12] The court similarly rejected KLP's arguments that it was impossible to perform on the contract of sale because the association was insolvent, and that to enforce the option to purchase at the contract price would be unconscionable.

## II.

Appellants make four arguments on appeal: (1) that in omitting the refinanced mortgage from the purchase price, the trial court misinterpreted Paragraph 11 of the TLOA; (2) that to enforce sale of the building at the purchase price ($584,132) determined by the trial court would be unconscionable; (3) that the trial court erred in finding that the tenants' association was solvent; and (4) that the trial court erred in admitting the opinions of two experts introduced by the tenants' association.

A. *Whether the trial court erred in calculating the purchase price.*

KLP contends that the trial court erred by excluding the $850,000 mortgage that KLP had refinanced in 2004 from the total purchase price the association had to pay. KLP argues that "the language regarding purchase price in the TLOA is so vague and unclear, that it is incapable of being specifically enforced." In the alternative, KLP argues that "the clear meaning of 'purchase price' in the TLOA is that any purchase, ... requires satisfaction of, or assumption of any outstanding deed(s) of trust on the Property by the purchaser."

■ We review the trial court's conclusions of law *de novo. See* D.C.Code § 17–305(a) (2001). Whether a contract is ambiguous, what its unambiguous terms mean, and whether a contract should be enforced, are questions of law. *See Malik Corp. v. Tenacity Group, LLC,* 961 A.2d 1057, 1060 (D.C.2008).

KLP's argument relies on subparagraphs 11(A)(1) and (2) of the TLOA. Subparagraph 11(A)(1) provides that "[t]he purchase price shall be One Million Five Hundred Thousand Dollars ($1,500,000), plus the amount of any outstanding deed of trust thereon...." (TLOA ¶ 11(A)(1)). Under that provision, the purchase price would be the sum of $1,500,000 *plus* the $850,000 refinanced mortgage, yielding a "purchase price" of $2,350,000. Subparagraph 11(A)(2) provides that the purchase

---

**11.** The court found, however, that the association continued to remain responsible for two existing obligations to the District of Columbia that had been acquired independently in the association's name in the amounts of $226,062 and $40,438, which were secured by mortgages on the property. These loans are not at issue on appeal.

**12.** The trial court explained: "While it may be one thing for the Defendants to recognize the Association's right to purchase and to allow it to make the necessary applications, it is quite another thing to deny the association its rights thereby preventing it from pursuing financing alternatives without the cloud that this litigation provides."

price may be paid all in cash, or by making a $1,500,000 cash payment and the purchaser's assumption of the outstanding deed of trust.[13] If subparagraphs 11(A)(1) and (2) were applicable, KLP's argument that the tenants' association must also pay the full amount of the mortgage or assume the mortgage would undoubtedly be correct.

But, as the trial court noted, those are not the only provisions in the TLOA that deal with the purchase price, nor are they the ones that apply in this case. Subparagraph 11(A)(4) of the TLOA provides that a different "purchase price" applies if the investors benefitted from accelerated depreciation:

> (4).... Further, it is the desire and intent of the parties that the Association and the individual tenants of the property obtain the advantage of the purchase price lower than that set forth in subparagraph [11(A)](1) above if, but only if, the Partnership is able to enjoy the benefits of Section 167 [of the I.R.C.] and of operating loss deductions with respect to that Property. Accordingly, and notwithstanding the provisions of subparagraph ... (1), it is agreed that unless the Internal Revenue Service or a court of competent jurisdiction has ruled or held that the partnership is not entitled to enjoy the benefits of Section 167 ..., the purchase price referred to in subparagraph ... (1) shall be reduced to the highest price which will assure that

the requirements of Section 167 ... are met.

TLOA ¶ 11(A)(4).

■ It is undisputed that the partners that invested in KLP enjoyed the tax benefits they anticipated by taking accelerated depreciation deductions.[14] By the terms of the TLOA, once the investors obtained that benefit, "the Association and the individual tenants of the property obtain the advantage of the purchase price lower than that set forth in subparagraph ... (1)," and "the purchase price referred to in subparagraph ... (1) shall be reduced to the highest price which will assure that the requirements of Section 167 [of the I.R.C.] ... are met." *Id.* Section 167 of the I.R.C. provided that:

> The ... sale of such units are pursuant to a program in which the sum of the taxable income, if any, from leasing of each such unit, for the entire period of such leasing, and the amount realized from sale or other disposition of a unit, if sold, normally does not exceed the excess of the taxpayer's cost basis for such unit of property, before adjustment under section 1016 for deductions under section 167, over the net tax benefits realized by the taxpayer, consisting of the tax benefits from such deductions under section 167 minus the tax incurred on such taxable income from leasing, if any.

I.R.C. § 167(k)(2)(B)(iii). The association's expert, Pokrant, calculated that pursuant to this formula, the purchase price would be $584,132, a calculation that KLP does not dispute.[15] Indeed, as the trial

---

**13.** "The purchase price shall be payable in cash at settlement, except that the portion of the purchase price attributable to outstanding deed of trust may be paid by the Association assuming the balances thereon, if approved by the holders of the deed of trust." (TLOA ¶ 11(A)(2)).

**14.** Although the TLOA also refers to the benefits of operating loss deductions, KLP has not

argued that the reduced purchase price does not apply because such deductions were not available to the KLP partners.

**15.** Pokrant arrived at the amount of $584,132 by subtracting the net tax benefits realized by the partners through accelerated depreciation ($435,360) from the cost basis of the property ($1,019,492). The cost basis of the property was calculated "[b]ased on the partnership's

court pointed out, KLP agrees that "the original cash portion of the purchase price of $1,500,000 is reduced to $584,132 pursuant to the depreciation reduction formula set forth in paragraph 11(4)." The sole dispute is the TLOA's allocation of responsibility for the outstanding mortgage; KLP argues that the *total* purchase price is the sum of the cash price—whether it be $1,500,000 under subparagraph 11(A)(1) or $584,132 under subparagraph 11(A)(4)— *plus* any outstanding deed of trust on the property, in this case, KLP's $850,000 refinanced mortgage.

We agree with the trial court's interpretation of Paragraph 11 of the TLOA, that the purchase cash price calculated in accordance with subparagraph 11(A)(4) is the sum total owed by the association, and is not to be augmented by KLP's outstanding deed of trust. The eventual sale of the property to the tenants' association was anticipated by the partners and was regulated by their written agreement in the carefully phrased terms of the TLOA. The investors, who, after all, were in the business to benefit financially from the partnership, specified two different ways to calculate the purchase price, depending on whether they would profit in the front-end, by taking accelerated depreciation deductions over the five years of the partnership,[16] or in the back-end, by selling the property after twenty years (without the benefit of accelerated depreciation) at a

profit of $1,500,000.[17] In the event that the investors were unable to take full advantage of the anticipated tax deductions through accelerated depreciation of the property, under subparagraph 11(A)(1) they would gain the full $1,500,000, as the tenants' association would pay or assume any outstanding deed of trust. But if the investors benefitted during the life of the accelerated depreciation allowance for their investments in low-income housing (at a four-to-one advantage), subparagraph 11(A)(4) controls, which caps the price by reference to Section 167(k)(2)(B)(iii) of the Internal Revenue Code.[18]

Our conclusion does not depend on an interpretation of the Internal Revenue Code provision—the parties agree that under I.R.C. § 167(k)(2)(B)(iii), the maximum allowable price is $584,132—but of which definition of "purchase price" in the TLOA is applicable to the tenants' association's offer to purchase. The TLOA defines the term "purchase price" in two different ways, depending on whether the KLP partners obtained the anticipated tax benefits. Under subparagraph 11(A)(1), the "purchase price shall be One Million Five Hundred Thousand Dollars ($1,500,000), plus the amount of any outstanding deed of trust thereon...." Under subparagraph 11(A)(4), "notwithstanding the provisions of subparagraph (A)(1) [with its reference to 'any outstanding deed of trust'] ..." "the purchase price referred to in subpara-

---

tax returns, the building, and improvements cost $984,972 and the land cost $34,520."

**16.** As suggested by the TLOA, this would be the preferred method as it would allow the investors to reduce their tax obligation in the present and benefit from the time-value of money they did not have to pay in taxes.

**17.** This was an "amount the parties agree[d] [would be] a reasonable projection of the expected fair market value of the property at that time, taking into account anticipated

physical depreciation of the improvements as well as expectations regarding inflation and interest rates." TLOA ¶ 11(A)(1).

**18.** In providing a formula to calculate the sale price for parties that have benefitted from accelerated depreciation, I.R.C. § 167(k)(2)(B)(iii) effectively restricted investors from "double dipping" by reducing taxes through accelerated depreciation and eventually selling at a profit that reflected the property's appreciation over time.

graph (A)(1) shall be reduced [according to the formula in I.R.C. § 167(k)(2)(B)(iii) ].” It cannot be any clearer from the plain language of subparagraph 11(A)(4), as the trial court noted, that in this case, where it is undisputed that the investors derived the hoped-for tax benefits, the purchase price of the property is restricted to the maximum allowed by Internal Revenue Code. *See, e.g., Hisler v. D.C. Dep't of Employment Servs.*, 950 A.2d 738, 746 (D.C.2008) (“In determining whether a contract is ambiguous, we examine the document on its face, giving the language used its plain meaning.” (citation omitted)).

We, therefore, affirm the trial court's judgment that $584,132 is the purchase price set by the TLOA, at which the tenants' association may purchase the property from KLP.

**B. *Whether the purchase price of $584,132 is unconscionable***

In the trial court, Namrow argued in closing that the court-ordered price of $584,132 is unconscionable because the building is worth much more than that amount.[19] On appeal, he still argues that the amount is unconscionable, but says that is because it falls short of the $850,000 mortgage, for which he is personally responsible, even though he did not derive any of the tax benefits, which had already lapsed when he took over the partnership.

 “Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.” *Patterson v. Walker–Thomas Furniture Co.*, 277 A.2d 111, 113 (D.C. 1971). The party invoking unconscionability as a defense to enforcement of a contractual term must prove both elements— lack of meaningful choice and terms unreasonably favorable to the other party—except that, “in an egregious situation, one or the other may suffice.” *Urban Invs. v. Branham*, 464 A.2d 93, 99 (D.C.1983). Whether a contract term is unconscionable is determined as of the time the contract is made. *See id.* at 100 n. 7 (citing cases); Restatement (Second) of Contracts § 208 (“If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.”).

Namrow does not claim that the various investment entities—the parties to the TLOA that he owns—lacked a meaningful choice when they entered into the TLOA or that the terms of the contract were unreasonably favorable to the tenants' association. Nor could he, as the evidence shows that they were a sophisticated group, represented by counsel, that joined the partnership for the purpose of taking advantage of accelerated depreciation deductions by investing in low-income housing. They enjoyed the tax benefits made possible by their investment in KLP. Moreover, there is no reason to believe that Paragraph 11 of the TLOA was so one-sided to benefit the tenants' association where the association's right to purchase at the lower price was contingent upon “[the investors' ability] to enjoy the benefits of Section 167 and of operating loss deductions with respect to the Property,” and the purchase price was the *maxi-*

---

**19.** An appraisal commissioned by Namrow showed the market value of the property as of September 21, 2006, as $2,825,000.

*mum* allowable by the Internal Revenue Code. (TLOA ¶ 11(A)(4)).

■ Namrow's claim of unconscionability rests on his individual circumstances, as they developed after the contract was executed. His claim is based on the fact that he personally will have to bear a loss of $265,868—the difference between the refinanced mortgage ($850,000) he claims that he personally guaranteed, see note 8, *supra*, and the purchase price set out in the contract ($584,132). But Namrow's current predicament is the consequence of his decision to assume the original investors' role in the TLOA. Namrow testified that he was fully aware that "they were taking four-to-one write-offs up until 1985 when the tax law changed," and that he "knew what [he] was coming [into]" when he "bought" the investors' shares for nothing. Any sympathy one might have for Namrow's plight is legally irrelevant to the unconscionability analysis, as the evidence shows that the parties to the TLOA freely entered into a contract, reasonable at the time, that unambiguously set out the purchase price at which the tenants' association could buy the property after the original investors had taken the accelerated depreciation. As the long-time manager of the property, see note 2, *supra*, Namrow either knew or should have known of the risk he was taking when he took over the investors' interest in KLP and decided, for his own purpose, to refinance the mortgage and provide a personal guarantee. "An unsupported conclusory allegation . . . that a contract is unenforceable as unconscionable is not enough." *Patterson*, 277 A.2d at 114. Namrow has failed to show "facts surrounding the 'commercial setting, purpose and effect' of a contract at the time it was made . . . so that the court may form a judgment as to the existence of a valid claim of unconscionability. . . ." *Id.* There is no reason why the TLOA should not be enforced according to its terms when the original parties to the agreement—the tenants' association and the investors—knowingly entered into it and are reaping the benefits from the bargain they struck.

C. *Whether the trial court's finding that the tenants' association was solvent was clearly erroneous.*

■ KLP argues that the trial court's finding that the association was solvent was clearly erroneous, and that the association's option to purchase is therefore void. As to the latter argument, the trial court concluded that "whether the Association is or was insolvent has no bearing on the validity of the Association's exercise of its option to purchase." We agree with the trial court's conclusion of the potential impact of the association's insolvency on its contractual rights because, under the terms of the TLOA, an adjudication of insolvency serves only to *terminate* the lease:

12. *Bankruptcy.* The term of this Lease shall cease and terminate if any of the following events occurs: (1) the Association is adjudicated Bankrupt or adjudged to be insolvent. . . .

Under Paragraph 11 of the TLOA, termination of the lease then triggers the association's right to exercise its option to purchase the property. ("The Association shall have the right to purchase all of the Partnership's right, title and interest in the Leased Premises effective upon termination of this Lease. . . ."). Thus, we agree with the trial court that whether the association had a right to purchase under the TLOA did not depend on the association's solvency. What triggered the option to purchase under the TLOA was "termination of [the] Lease at the end of its [twenty year] Term." That is when the association gave notice that it wished to

exercise its option; KLP did not seek to terminate the lease at an earlier time due to the association's alleged insolvency.[20]

 We also conclude that there is evidence to support the trial court's finding that the tenants' association is solvent. " 'Insolvent' means that a corporation is unable to pay its debts as they become due in the usual course of its affairs." D.C.Code § 29–301.02(8) (2001). Appellants' expert, Norman Eule, testified that it was his opinion that the tenants' association was insolvent because, based on the deposition of Dovie Dozier, who was then the president of the tenants' association, the association (1) had not paid $700 in interest and fees to the Unitarian Universalist Affordable Housing Corporation ("UUAHC"); (2) did not have more than $1,000 in its bank account; and (3) had received a default notice from the D.C. Department of Housing and Community Development ("DHCD") on a $253,050 note.

The trial court found that the tenants' association successfully refuted these allegations. The trial court credited the testimony of Mark Knight, the President and CEO of UUAHC, who testified that the association had "paid back the interest, which was above and beyond what had been [borrowed].... And they did it with-

in months of having repaid the [loan]." With respect to the loan from DHCD, as the trial court noted, the loan agreement provides that in February of each year, the association was to pay either the amount set forth in the payment schedule or "all funds [the association] has available from the previous calendar year after payment of all accounts payable...." If the association's available funds are insufficient to make the scheduled payment, the remaining balance rolls over to the following year. Any balance remaining becomes due either when the property is sold or in 2012, whichever comes first—neither of which has yet come to pass.[21]

Moreover, under the terms of TLOA, Phoenix (one of the entities controlled by Namrow) was responsible for making capital contributions to KLP that would be used towards paying off the loan.[22] The DHCD loan agreement recognized this relationship:

The parties agree that the Association's ability to make the payments called for by Section 2 is dependent upon the viability of the entire project ... and that such viability is in turn dependent upon Phoenix making the contributions of capital to the [Kenyon Limited] Partnership ...; accordingly, it is agreed that

**20.** A determination that the association was insolvent could well have an impact on whether the trial court would order the sale to go forward.

**21.** The loan agreement provides:
2. The association will repay the full amount of the outstanding loans in accordance with the following payment schedule: .... [and on] February 15, 2012 or at the sale of the property, whichever is first ... the unpaid balance.
3. Notwithstanding Section 2, the Association commits to pay to DHCD on February 15 of every year ... all funds it has available from the previous calendar year after payment of all accounts payable of the As-

sociation. When the Association has repaid a total of $253,050, no further payments to DHCD will be required. If the Association has available to it on any February 15 less than the amount stated in Section 2, the amount of the deficiency will be added to the amount owed on the subsequent February 15. DHCD shall have the right to make an independent determination as to whether the Association does or does not have a sufficient amount available to make the required payment.....

**22.** Phoenix agreed to make contributions over the course of 12 years for a total amount of $397,063. See note 3, *supra*.

any legally unjustified failure on the part of Phoenix to make such capital contributions will damage DHCD to the extent such failure results in the Association not making the payments called for by Section 2....

But Phoenix did not make the contributions as required[23]—a delinquency that the trial court termed as "a classic example of lack of clean hands." Finally, KLP's argument that the association was insolvent based on the testimony that the association had only $1,000 in its bank account, without providing specific evidence of the association's obligations in excess of that amount at a particular time, did not persuade the judge. On this record, the trial court's finding that the association was solvent was not clearly erroneous and was supported by evidence of record.

D. *Whether the trial court erred in admitting two experts' opinion testimony.*

KLP argues that the trial court erred in relying upon the opinions of two experts, Robert Moore, Sr., and Gary Pokrant, because the tenants' association did not disclose that it intended to call Moore as an expert prior to trial, as required by Superior Court Civil Rule 26(b)(4); and, as to Pokrant, who was listed as an expert in the association's pretrial statement, because the trial court erroneously admitted his testimony concerning the proper interpretation of the TLOA, a legal issue on which he was not qualified to offer an opinion.

1. *Robert Moore, Sr.*

■ The purpose of requiring that a party identify experts that it intends to call at trial is to give notice, so that the "opposing party has an opportunity to examine the expert's background and opinion prior to trial." *Abbey v. Jackson*, 483 A.2d 330, 335 (D.C.1984). Civil Rule 26(b)(4) allows a party to seek facts and opinions held by an expert that were "acquired or developed in anticipation of litigation." Super. Ct. Civ. R. 26(b)(4). Here, appellants complain that because Moore was not identified as an expert in the association's pretrial statement, they were denied the opportunity to prepare to cross-examine Moore at trial. But the judge remedied this problem at the end of trial by allowing appellants' counsel to re-open discovery to depose the witness and call additional experts, an opportunity that counsel did not seize.[24]

■ Moreover, although the trial court considered Moore's testimony along with that of appellant's expert, Norman Eule, on the question of the association's readiness to purchase the property, it is not clear that the opinion Moore presented at trial was "acquired or developed in anticipation of litigation."[25] But even if we

---

**23.** An audit revealed that Phoenix owed $232,609 in capital contributions as of December 31, 2004.

**24.** The trial court ordered, "I'm going to give the other side [KLP] the right to depose Mr. Moore, costs of transcripts to be assessed to the [tenants' association], and that in the event they either want to recall Mr. Moore and/or identify additional experts for their side, I'll hear them at that time."

**25.** Moore's testimony was based on his personal experience as President of the Development Corporation of Columbia Heights ("DCCH"), a community-based organization that helps tenant groups in the Columbia Heights neighborhood to purchase and renovate their apartment buildings by educating the residents and providing contacts for possible future partnerships. KLP's counsel specifically objected to Moore's testimony that according to his contacts with various lenders in the area, the tenants' association had a good chance of obtaining financing to purchase the building from KLP. The court found, however, that Moore "has been ac-

assume that his testimony was erroneously admitted and considered as expert opinion, we see no abuse of discretion on the part of the judge, who, as noted, afforded counsel an opportunity to re-open discovery in order to depose Moore and call additional experts. *See Johnson v. United States,* 398 A.2d 354, 361 (D.C.1979) (noting that an inherent part of an appellate determination that trial court has "abused" discretion is finding of prejudice warranting reversal).

### 2. *Gary Pokrant*

KLP's counsel objected to Pokrant's calculation of the purchase price owed by the association under the contract:

> Your Honor, this witness issued a report certifying a calculation based upon the IRS depreciation. He is not here to testify—to interpret a contract and the price of the contract. The contract speaks for itself.

The trial court initially agreed with the objection, but decided to hear Pokrant's testimony subject to the objection. After hearing Pokrant testify, the trial court overruled KLP's objection.

 "The decision whether to admit or require expert testimony on a particular state of facts is confided to the sound discretion of the trial court, and we have described that discretion as 'broad.'" *Varner v. District of Columbia,* 891 A.2d 260, 266 (D.C.2006). On this record, it is perfectly understandable why the trial court decided to admit Pokrant's expert testimony. Pokrant is a tax analyst at an accounting firm that was familiar with KLP's affairs at the time the initial investments were made and during the accelerated depreciations period.[26] Pokrant cal-

---

quainted with the [tenants' association] for some time ... [and] has known individual tenants at 1372 Kenyon St. for many more years...." Thus, Moore's knowledge of the association's financial readiness to purchase the building appears to have been based on his work as President of DCCH—which had been engaged to provide such assistance to the association—and not "acquired or developed" for the purposes of this litigation. Super. Ct. Civ. R. 26(b)(4). *See Aon Risk Servs. v. Estate of Coyne,* 915 A.2d 370, 375 (D.C. 2007) ("And even though [the party] did not list [the doctor] on its Superior Court Civil Rule 26(b)(4) expert witness disclosure statement (and he therefore was not permitted to testify to any facts and opinions that he 'acquired or developed in anticipation of litigation or for trial,' ...), it was permissible for [the doctor] to testify as an expert about opinions that he developed as 'an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit.'") (citation omitted); *District of Columbia v. Howard,* 588 A.2d 683, 692 (D.C. 1991) ("In distinguishing treating physicians from Rule 26(b)(4) experts, the crucial inquiry is 'whether the facts and opinions possessed by the expert were obtained for the specific purpose of preparing for the litigation in

question.'"). We need not decide whether the trial court's ruling that Moore was testifying as an expert was in error because, as we explain in the text, the trial court took steps to mitigate any prejudice to appellant for admission of his testimony.

26. Pokrant testified that his firm, Reznick Group, had provided tax services to KLP in the past:

Q. Mr. Pokrant, did Reznick Group have an affiliation with any of the parties in this case prior to [the tenants' association] approaching you?

A. I believe we did. Back at the time of the early '80s, I believe Mr. Namrow was a client of the firm's or his company—and his company was, and that continued up through the early '90s, about '92 or '93.

Q. Okay. So it's your understanding that Kenyon L.P. would have been a client of the firm—

A. Correct.

 \* \* \*

Q. Okay. And what services—do you know what services your firm provided for Kenyon L.P.?

A. I believe most of those years we provided audit financial statements and income tax return preparation.

culated the purchase price of the property, see note 15, *supra*, which was disclosed to KLP prior to trial. Indeed, KLP deposed Pokrant before trial and stipulated to the accuracy of his calculation based on the relevant I.R.S.Code provision, § 167(k)(2)(B)(iii). As noted, KLP's sole objection at trial, as on appeal, is based on its view that the amount thus derived constitutes only part of the purchase price set out in the TLOA, and that the amount of the outstanding deed of trust should be included in the purchase price. This is an interpretation of the TLOA that we have already rejected as a matter of law because the contract clearly provides that the purchase price is to be calculated solely in accordance with § 167(k)(2)(B)(iii). Therefore, any opinion that Pokrant may have expressed about the connection between the calculation based on the Internal Revenue Code provision and the purchase price called for under the TLOA was, at best, superfluous.

For the foregoing reasons, the judgment of the trial court that the tenants' association has a contractual option to purchase the property for $584,132, and that it is entitled to specific performance of the contract, is

*Affirmed.*