# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-3059

_____

Jerri Plummer

*Plaintiff - Appellee*

v.

Rhett McSweeney; David Langevin; McSweeney Langevin, LLC

*Defendants - Appellants*

Whitney Shoemaker, D.O.; Women's Health And Surgery Center, LLC; *Plaintiff* Funding Holding, Inc., doing business as LawCash; Vincent Chhabra; Michael Chhabra; LawFirm Headquarters, LLC; Surgical Assistants, Inc.; Wesley Blake Barber; Kasia Osadzinska, M.D.; Boston Scientific Corporation; Alpha Law, LLP; Richard Martindale; John Does, 1-97 (originally named as 1-99); Ron Lasorsa; Diane Sugimoto

*Defendant*s

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 24, 2019
Filed: October 23, 2019

_____

Before GRUENDER, ARNOLD, and GRASZ, Circuit Judges.

_____

ARNOLD, Circuit Judge.

This case is about the enforceability of an agreement to arbitrate disputes between a law firm and its client. Though we share some of the client's and the district court's concerns about the events giving rise to this lawsuit, we hold that the district court erred in refusing to enforce the agreement. We therefore reverse and remand.

Arkansas resident Jerri Plummer received a wholly unexpected phone call one day in October 2014 from someone named Yolanda. Yolanda knew that Plummer had had a transvaginal mesh implanted about six years earlier, and Yolanda asserted that the mesh was defective and that Plummer could die if she did not have it removed. Yolanda informed Plummer that she could arrange for Plummer to undergo surgery in Florida to have the mesh removed and could connect her with an attorney who could help her obtain compensation for the surgery and for her travel to Florida. Since Yolanda knew some of her medical history and since Plummer had recently experienced minor pain she attributed to the mesh, she agreed to Yolanda's arrangement. Plummer explains that, after the call, she felt as if she "had a ticking time bomb inside of" her. Plummer traveled to Florida and had the mesh removed about two months later.

Plummer maintains that the surgery has caused her substantial and ongoing medical problems. She sued a horde of defendants in the medical and legal fields for fraud, constructive fraud, breach of fiduciary duty, civil conspiracy, unjust enrichment, violations of the Arkansas Deceptive Trade Practice Act, and malpractice. Among those sued were Minnesota attorneys Rhett McSweeney and David Langevin and their law firm, McSweeney Langevin, LLC, whom we refer to collectively as "McSweeney Langevin." McSweeney Langevin moved the district court to compel arbitration in light of a retainer agreement that Plummer had signed. That agreement contained a provision beginning with the phrase "Alternate Dispute

Resolution" in bold type that went on to say that, if mediation failed to resolve any disputes the parties might have, they "agree to submit their dispute to binding arbitration in Washington D.C. before JAMS," which is an organization specializing in alternative dispute resolution. The agreement then provides: "CLIENT HEREBY ACKNOWLEDGES THAT ARBITRATION IS CLIENT'S ONLY RECOURSE AND THAT CLIENT WAIVES CLIENT'S RIGHT TO TRIAL BY JURY AND TO JUDICIAL APPEAL BY SIGNING THIS AGREEMENT."

The district court held that the parties had entered into a contract, but it declined to enforce it on the ground that the contract was unconscionable under Washington D.C. law, which the parties agree is appropriate under a choice-of-law provision in the agreement. As the district court saw it, "the defendant attorneys and their firm, through agents acting on their behalf, somehow got their hands on Plummer's cell phone number and, after instilling fear of death in her, solicited her to not only undergo a surgical procedure in another state, but also to allow them to represent her" in a lawsuit against the mesh's manufacturer. The district court found significant Plummer's statement that she felt she "was in a life or death situation and there was no time to dicker over details with people who informed [her] of [her] possible impending death and offered a procedure to save [her] life and to seek justice on [her] behalf." Further, the court pointed out that McSweeney and Langevin were attorneys, but Plummer had a tenth-grade education, was inexperienced in reading contracts, and did not know what arbitration was. The district court also noted that the retainer agreement was sent to Plummer electronically along with several other documents she was asked to sign. Finally, the court found that Plummer could not afford the costs of arbitration: Her income was minimal, and her share of the arbitration costs and her travel costs made arbitration inaccessible.

McSweeney Langevin appeals the district court's denial of the motion to compel arbitration—a decision we review de novo. *See Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019). We are a little uncertain about the procedural

posture in which this case comes to us. Under the Federal Arbitration Act, Plummer arguably could have demanded a jury trial on the question of the enforceability of the arbitration clause. *See* 9 U.S.C. § 4. *But see Am. Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 710 (5th Cir. 2002). She did not do so, however, and so the motion here could have eventually been resolved by a trial to the district court. *See Neb. Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 743–44 (8th Cir. 2014). Though neither party, so far as we can tell from the record, moved for summary judgment, the district court ruled in Plummer's favor as a matter of law based on what it concluded were the undisputed facts set forth in Plummer's amended complaint, declarations attached to Plummer's responses to the motion to compel arbitration, and some supplemental sworn submissions. In its briefs, McSweeney Langevin raised no objections to this procedure or to the district court's determination that there did not exist genuine issues of material fact necessitating a trial, and at oral argument it eschewed any interest in doing so. We therefore accept the district court's findings as true and deal only with their legal consequences.

McSweeney Langevin maintains first that an arbitrator should decide the matter of unconscionability, not a court, because Plummer's arguments about unconscionability, and the district court's acceptance of them, are directed at the retainer agreement as a whole and not just the arbitration provision within it. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006). McSweeney Langevin, however, failed to raise this matter to the district court, and this is not merely a new argument; it is an entirely new issue, *see Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 508 (8th Cir. 2012), so we review it for plain error at most. But we have held before that "the requirement to proceed in federal court can hardly be considered a miscarriage of justice" necessitating plain-error relief. *See Wiser v. Wayne Farms*, 411 F.3d 923, 927–28 (8th Cir. 2005).

We therefore take up the matter of unconscionability ourselves. Under the FAA, agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon

such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. One of these grounds is unconscionability. *See Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017). Under the governing D.C. law, "a contract may be unconscionable either because of the manner in which it was made or because of the substantive terms of the contract or, more frequently, because of a combination of both." *See Urban Invs., Inc. v. Branham*, 464 A.2d 93, 99 (D.C. 1983) (per curiam). These two concepts are frequently referred to as procedural unconscionability and substantive unconscionability. *Id.*

We begin with substantive unconscionability, which in this case involves Plummer's ability to pay for arbitration. Though the arbitration provision does not mention who will pay the costs of arbitration, it does say that arbitration will proceed before JAMS, and JAMS rules provide that parties will pay a pro rata share of costs unless they agree otherwise. According to the district court, Plummer provided evidence that her share of costs was extremely high compared to her income, rendering arbitration prohibitively expensive.

We do not decide whether the district court correctly found that Plummer had carried her burden to show that arbitration was prohibitively expensive. On appeal, McSweeney Langevin has offered to pay Plummer's share of the arbitration costs, which, it asserts, cures any substantive unconscionability in the contract. Plummer maintains that we should not consider post-hoc offers like this one since others bound by the same contract terms might be dissuaded from pursuing claims because of the high costs of arbitration. We recognize that other courts agree with her. *See, e.g.*, *Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 217–18 n.2 (3d Cir. 2003); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 676–77 (6th Cir. 2003) (en banc). Plummer also points out that D.C. courts have noted that unconscionability is determined at the time the contract is made. *See Urban*, 464 A.2d at 99–100 n.7.

We nevertheless hold that McSweeney Langevin's offer has cured any substantive unconscionability that the agreement may have contained. We rely heavily on the fact that at least two (and probably three) separate Washington D.C. federal district courts applying D.C. law have allowed post-hoc offers to cover arbitration expenses to cure substantive-unconscionability difficulties. *See Fox v. Comput. World Servs. Corp.*, 920 F. Supp. 2d 90, 102 (D.D.C. 2013); *Nelson v. Insignia/Esg, Inc.*, 215 F. Supp. 2d 143, 157 (D.D.C. 2002); *see also Nur v. K.F.C., USA, Inc.*, 142 F. Supp. 2d 48, 52 (D.D.C. 2001). These courts are presumptively familiar with D.C. law, and so we think their approval of this strategy best reflects that law. And though D.C. courts have observed that unconscionability is determined at the time the contract is made, that does not mean that a defendant cannot cure any substantively unconscionable provisions it contains by offering to pay for arbitration. Courts invoke this time-of-the-making rule when one party argues that a contract, though enforceable when formed, has subsequently become unconscionable due to changes in circumstances. *See, e.g.*, *Kenyon Ltd. P'ship v. 1372 Kenyon St. Nw. Tenants' Ass'n*, 979 A.2d 1176, 1186–87 (D.C. 2009). We deal with the opposite situation here.

We also point out that our court has allowed defendants to cure substantive-unconscionability difficulties by offering to pay for arbitration, though admittedly we were not applying D.C. law. *See E.E.O.C. v. Woodmen of World Life Ins. Soc'y*, 479 F.3d 561, 567 (8th Cir. 2007). And we have done so even when the offer was made as late as during oral argument. *See Dobbins v. Hawk's Enters.*, 198 F.3d 715, 717 & n.4 (8th Cir. 1999). We think that permitting McSweeney Langevin to cure substantive unconscionability in this way is sensible since D.C. law allows a court to sever an unconscionable term from a contract and enforce the rest of it. *See Kenyon*, 979 A.2d at 1186. So it seems we can do the same here. *See Faber v. Menard, Inc.*, 367 F.3d 1048, 1054 (8th Cir. 2004). We don't detect any substantive unconscionability in the present circumstances.

The district court also held that, because Plummer cannot afford arbitration, the arbitration provision is substantively unconscionable for the additional reason that it in effect allowed only McSweeney Langevin to obtain redress of claims. But now that McSweeney Langevin has offered to pay Plummer's share of arbitration costs, Plummer is not precluded from seeking redress. The district court, moreover, seems to be relying here on a resistant strain of Arkansas case law that holds that a party's promise to arbitrate disputes is not enforceable unless the other party promises to arbitrate as well. The Supreme Court of Arkansas relies on the principle of "mutuality of obligation" to support this line of cases. *See Indep. Cty. v. City of Clarksville*, 386 S.W.3d 395, 399–400 (Ark. 2012). But there is no such requirement under D.C. law, so far as we have discovered, and even if there were we would not apply it because it contravenes the FAA's directive that courts place arbitration contracts on an equal footing with other contracts. *See Kindred Nursing*, 137 S. Ct. at 1424; 9 U.S.C. § 2.[1] We therefore reject this other ground for finding that the arbitration provision was substantively unconscionable.

Usually a plaintiff must show both procedural and substantive unconscionability to render a contract unenforceable, but "in an egregious situation, one or the other may suffice." *See Urban*, 464 A.2d at 99. The district court here said that, even without a showing of substantive unconscionability, Plummer had demonstrated an "egregious" instance of procedural unconscionability. One D.C.

---

[1] Arkansas law, for good reason, does not require on "mutuality of obligation" grounds or any other, that a party's promise, say, to build a house is not enforceable unless the other party also promises to do so. Our court has already intimated that the rule followed in Arkansas with respect to arbitration agreements therefore violates the FAA, *see Dickson v. Gospel for ASIA, Inc.*, 902 F.3d 831, 835 (8th Cir. 2018); *Se. Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC*, 588 F.3d 963, 966–68 (8th Cir. 2009); *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 792 (8th Cir. 1998), and an Arkansas federal district court has specifically held as much—we think correctly. *See Enderlin v. XM Satellite Radio Holdings, Inc.*, No. 4:06-CV-0032 GTE, 2008 WL 830262, at *10 (E.D. Ark. Mar. 25, 2008).

federal district court pointed out not long ago, though, that "there do not appear to be any reported D.C. cases finding such an 'egregious' scenario." *See Ruiz v. Millennium Square Residential Ass'n*, 156 F. Supp. 3d 176, 180 (D.D.C. 2016). Perhaps for good reason: As D.C. courts have explained, a showing of substantive unconscionability is usually needed because, "[w]ithout proof that the terms are unfair, the court normally will be unable to ascertain what detriment the weaker party suffered as a result of the bargaining process." *Urban*, 464 A.2d at 100. So without a showing of substantive unconscionability, Plummer faces an uphill task at best.

To determine whether an agreement is procedurally unconscionable, D.C. courts consider all the circumstances surrounding the transaction, such as the parties' bargaining power, the parties' opportunity to understand the contract's terms, the manner in which the contract was entered, the relative expertise of the parties, and the length of time in which the contract was completed. *See Associated Estates LLC v. BankAtlantic*, 164 A.3d 932, 943 (D.C. 2017). But this all appears to boil down to deciding "whether the party seeking to void the contract lacked a 'meaningful choice.'" *Id.* D.C. courts often use the phrase "procedural unconscionability" interchangeably with "an absence of choice." *See, e.g.*, *Woodroof v. Cunningham*, 147 A.3d 777, 789 (D.C. 2016).

We fail to see how Plummer lacked a meaningful choice. We recognize she received the retainer agreement merely three days before she departed for surgery in Florida. We also understand that the message was sent to her electronically along with other documents requiring her signature, and that the message requesting her signature stated that it was "URGENT." But by this time, Plummer had had more than a month to get to the bottom of the phone call from Yolanda—a call that should have raised her antennae. During that time she could have spoken to other attorneys or even her doctors about the situation.

-8-

We also note that the agreement itself expressly informed Plummer, in bold letters, that she had the "Freedom to Contract." That provision explained that Plummer "has the freedom to bargain for and negotiate any of the terms of this Agreement or to consult with or retain any attorneys of [her] choice." The retainer agreement itself is six pages, including nearly one whole page dedicated to signature blocks, and it is in an easy-to-read format. So even if Plummer only scanned the contract before signing it, her eyes likely would have been drawn to this information.

Plummer maintains that she could not have bargained with McSweeney Langevin over the agreement's terms anyway. But we think this assertion is too speculative. For one thing, the terms of the agreement belie it. And given that she did not attempt to bargain with McSweeney Langevin over the agreement's terms, it is difficult to see why she thinks she could not have. *See Woodroof*, 147 A.3d at 789. Even if we assume she could not have bargained with McSweeney Langevin over terms, there is no showing that she could not have obtained legal services elsewhere. "The mere fact that a contract is take-it-or-leave-it does not render a party 'powerless' and without 'real choice'" if she can get services elsewhere in the market. *See Ruiz*, 156 F. Supp. 3d at 181.

Plummer also points to her failure to read the retainer agreement as a reason supporting procedural unconscionability. But "one who signs a contract has a duty to read it" and "cannot escape being bound by its terms merely by contending that [s]he did not read them." *See Curtis v. Gordon*, 980 A.2d 1238, 1244 (D.C. 2009). It is also of little relevance in the circumstances that other documents requiring her signature were sent to her at the same time, *see Pan Am Flight 73 Liaison Grp. v. Dave*, 711 F. Supp. 2d 13, 24 (D.D.C. 2010), or that the agreement was sent to her electronically. *See Fox*, 920 F. Supp. 2d at 98.

In short, we cannot say that the circumstances giving rise to this lawsuit, though admittedly troubling, render the retainer agreement at issue procedurally

unconscionable since Plummer has not demonstrated she lacked meaningful choice. We therefore reverse the district court's decision not to enforce the agreement on the ground of unconscionability.

Plummer advances an alternative ground for affirmance: She maintains that the agreement is unenforceable because McSweeney and Langevin violated their ethical duties as attorneys when they failed to explain the ramifications of the arbitration provision to her. In particular, Plummer maintains that McSweeney and Langevin failed to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation," as relevant ethical rules require. *See* D.C. R. Prof'l Cond. 1.4(b). It's not entirely clear to us when the attorney-client relationship between McSweeney Langevin and Plummer arose; it appears that it was either in its nascent stages or that the parties were on the cusp of such a relationship at the time Plummer received the retainer agreement. McSweeney Langevin was at least aware as of November 2014 that Plummer had been contacted on its behalf. For the sake of argument, we assume that an attorney-client relationship had been formed before the agreement was signed.

"A contract that is contrary to public policy is generally unenforceable." *Shtauber v. Gerson*, 239 F. Supp. 3d 248, 253 (D.D.C. 2017). Though D.C. courts have not said whether their rules of professional conduct are an expression of D.C. public policy that can render a contract unenforceable, *see id.*, one federal district court interpreting D.C. law said they were, *see Moskowitz v. Holman, PLLC*, No. 1:15-cv-336, 2016 WL 356035, at * 11 (E.D. Va. Jan. 28, 2016), and a D.C. federal district court said the rules were an expression of public policy but that whether a contract entered into in violation of those rules is unenforceable depended on the circumstances. *See Shtauber*, 239 F. Supp. 3d at 255. We assume for the sake of argument that the arbitration provision would be unenforceable if McSweeney and Langevin indeed violated Rule 1.4(b).

We hold they did not. Though we recognize that courts closely scrutinize agreements between attorney and client because of the attorney's fiduciary obligations, *see Haynes v. Kuder*, 591 A.2d 1286, 1291 (D.C. 1991), the contract here apprised Plummer of the basic consequences of the arbitration provision. It specifically explained, in conspicuous, capital letters that, in the event of a dispute, arbitration was Plummer's only recourse, that Plummer was waiving her right to a jury trial, and that Plummer was waiving her right to a judicial appeal.

*Haynes* involved a situation very similar to ours. There, an attorney and someone "at the threshold of an attorney-client relationship" entered into a retainer agreement containing an arbitration provision that said, in essence, that disputes would be resolved by "arbitration, rather than court action." *Id.* at 1288–90. The D.C. high court acknowledged that the provision "was somewhat terse in explaining the rights [the client] would relinquish by agreeing to arbitration" but nevertheless held that the contract contained enough information about arbitration that the attorney did not violate his ethical obligations. *See id.* at 1290–91. And so the court enforced it.

Plummer argues that *Haynes* is distinguishable and no longer good law in any event. She first points out that *Haynes* involved fraudulent inducement and not unconscionability. We see this as a distinction without a difference. Both cases involve the matter of whether an attorney's nondisclosure makes an arbitration agreement unenforceable. Plummer also argues that the legal landscape has changed since *Haynes* was decided. She observes that the ethics opinion that the *Haynes* court viewed as its polestar, *see* D.C. Bar Comm. on Legal Ethics, Op. 190 (1988), has been "repealed." Opinion 190 provided that, when a retainer agreement contains an arbitration clause, "the attorney has the obligation to make a full disclosure to the client of all the ramifications of an agreement to arbitrate, including eliminating the right to sue in court and have a jury trial."

-11-

Plummer is correct that a later ethics opinion "conclude[d] that Opinion 190 was incorrect in supposing that adequate disclosures concerning mandatory arbitration could be made to lay clients," *see* D.C. Bar Comm. on Legal Ethics, Op. 211 (1990), thereby setting an impossibly high bar on the amount of disclosure necessary. But the *Haynes* court did not adopt that impossible bar. It was well aware of this subsequent opinion when it decided the case, moreover, even citing it, *see Haynes*, 591 A.2d at 1291 n.11, and yet it still found Opinion 190 persuasive on the matter of how much disclosure is necessary. We have no reason to suspect that the D.C. high court would now adopt the views set forth in Opinion 211, especially considering that earlier this year Opinion 211 was itself superseded by yet another opinion that sought "to loosen" its requirements. *See* D.C. Bar Comm. on Legal Ethics, Op. 376 (2019). According to Opinion 376, all that is required is that an attorney make the client "fully informed of the scope and effect of the agreement," *see* D.C. R. Prof'l Cond. 1.8 cmt. 13, which is essentially the same standard as the one applied in *Haynes*. More important, we doubt that the D.C. high court will slavishly adjust its view of the applicable law to resonate with the vacillations of the D.C. Bar Committee's ethics opinions. It is the ethics rules themselves that provide potential guidance in cases like this.

Plummer also points out that, since *Haynes*, the American Bar Association released an ethics opinion on the effect of its Model Rule 1.4(b) (on which D.C. Rule 1.4(b) is based) on the use of arbitration provisions in retainer agreements. *See* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 02-425 (2002). The ABA opined that "the lawyer should make clear that arbitration typically results in the client's waiver of significant rights, such as the waiver of the right to a jury trial, the possible waiver of broad discovery, and the loss of the right to appeal." It also notes other effects that an attorney "might explain" as well. Some courts have even expanded on this opinion, requiring attorneys to discuss with clients a wide assortment of the potential consequences that could attend agreeing to arbitrate

disputes with an attorney. *See, e.g.*, *Hodges v. Reasonover*, 103 So. 3d 1069, 1077 (La. 2012).

But ABA ethics opinions do not bind us or the D.C. courts, *see United States v. Straker*, 258 F. Supp. 3d 151, 156–57 (D.D.C. 2017), and this one in particular says nothing that convinces us that the D.C. high court would no longer follow *Haynes*. Plummer relies too heavily on non-binding ethics opinions. We instead rely on an actual, on-point case from the relevant court. Given that the D.C. high court in *Haynes* brushed aside Opinion 211, an opinion from closer to home that also imposed heightened requirements on arbitration provisions in retainer agreements, we have no reason to think it would treat the ABA opinion differently if confronted with it. We repeat that it's the rules of ethics themselves, not opinions about those rules, that potentially represent an expression of D.C. public policy, the violation of which could render an agreement unenforceable. We therefore reject Plummer's attempt to cast doubt on *Haynes*'s continuing vitality and its application to this case. The disclosures here were broader than those in *Haynes*, so we necessarily decline to hold that the arbitration provision at issue here is unenforceable.

We reverse and remand with instructions to the district court to grant the motion to compel and to order arbitration at McSweeney Langevin's expense.

———————————————