# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3581

FIDELITY NATIONAL TITLE INSURANCE COMPANY
OF NEW YORK,

*Plaintiff,*

v.

INTERCOUNTY NATIONAL TITLE INSURANCE
COMPANY, *et al.*,

*Defendants.*

Appeal of:

    MYRON M. CHERRY & ASSOCIATES LLC

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 5658—**Suzanne B. Conlon**, *Judge.*

———————

SUBMITTED OCTOBER 25, 2002—DECIDED NOVEMBER 8, 2002

———————

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Fidelity National Title Insurance contends that $20 million vanished from real estate escrow accounts under the control of defendants and related entities. It seeks a judgment for that amount in this diversity litigation. Five of the defendants—Intercounty

National Title Insurance Co., Intercounty Title Co., INTIC Holding Co., Terry Cornell, and Susan Peloza (collectively the INTIC parties)—retained Myron M. Cherry & Associates LLC to represent them in the suit. The three corporations are defunct but have made claims against co-defendants (and third parties) that may have value; the financial status of Cornell and Peloza, who controlled the three corporations, is unclear. The INTIC parties promised to pay Cherry an hourly fee for its services and to reimburse expenses. For some time they kept this promise. But about a year ago they began to fall behind, and by July 2002, when Cherry first moved to withdraw, they owed more than $430,000 in fees and out-of-pocket expenses. (The total now exceeds $470,000.) Cherry informed the district court that its clients had stopped paying and were making no efforts to engage new counsel. The district judge denied this motion to withdraw and a later one, making it clear that in her view Cherry must represent the INTIC parties to the bitter end, no matter how much this costs (and no matter how little the INTIC parties pay), unless a new lawyer files an appearance on their behalf. Substitution is unlikely, because the district court's order provides Cherry's clients with free legal assistance, while the INTIC parties would have to give any replacement a hefty retainer (for Cherry anticipates that the trial of the suit may require lawyers' time plus outlays for copying, transcripts, and other expenses that will bring the total tab to $1 million). Cherry, which does not fancy throwing good time after bad, asks us to reverse the district court's order and to permit its withdrawal.

Appellate jurisdiction depends on the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). The Supreme Court has held that neither an order disqualifying a lawyer, nor an order declining to do so, is appealable under this doctrine. *Richardson-Merrell Inc. v. Koller*, 472 U.S. 424 (1985); *Firestone Tire & Rubber*

*Co. v. Risjord*, 449 U.S. 368 (1981). Orders denying motions to withdraw are superficially similar to orders denying motions to disqualify. But there is also a vital difference: incorrect decisions about disqualification may justify reversal at the end of the case, while an incorrect decision forcing an unpaid lawyer to continue providing services never would supply a reason to reverse the final judgment. Because an order compelling a lawyer to work without prospect of compensation is unrelated to the merits of the dispute, cannot be rectified at the end of the case, and has a potential to cause significant hardship, we join the second circuit in holding that the order is immediately appealable as a collateral order. See *Whiting v. Lacara*, 187 F.3d 317, 320 (2d Cir. 1999). Accord, *Industrial Distribution Corp. v. Polytop Corp.*, 2001 U.S. App. LEXIS 16679 (1st Cir. Feb. 21, 2001) (non-precedential order). An interim order keeping the lawyer in the case while the motion to withdraw was under advisement would not meet *Cohen*'s requirement that the decision finally determine the issue in question, but there can be no doubt that the district judge's order is conclusive because it allows reconsideration only if the INTIC parties retain new counsel. This is as final a denial as is conceivable.

Responding to an order this court issued, the INTIC parties have made it clear that they do not have another lawyer. Nor do they promise to retain one or to pay Cherry. It is therefore difficult to see why Cherry should be obliged to provide them with future legal services. Litigants have no right to free legal aid in civil suits. The INTIC parties do not appear to be good candidates for *pro bono* representation—which is at any event voluntary rather than compulsory. See *Mallard v. United States District Court*, 490 U.S. 296 (1989). Corporations don't qualify for even the slight benefit of proceeding *in forma pauperis*. See *Rowland v. California Men's Colony*, 506 U.S. 194 (1993).

The ABA's *Model Rules of Professional Conduct* state that lawyers are entitled to stop working when clients stop paying. Rule 1.16(b) provides that a lawyer may withdraw if

> (5) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;

> (6) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or

> (7) other good cause for withdrawal exists.

Failure to cover $470,000 in legal fees and expenses (despite undertaking via contract to do so) satisfies subsection (5), and the prospect of a further uncompensated outlay worth $500,000 satisfies subsection (6), especially because Cherry is a small law firm (it has four lawyers). See Geoffrey C. Hazard, Jr. & W. William Hodes, 1 *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* §1.16:303 (1990 & 1998 Supp.). The Northern District of Illinois has promulgated ethical rules that depart slightly from the *Model Rules*, but Local Rule PRC 1.16(b)(1)(F) permits a lawyer to withdraw if the client "substantially fails to fulfill an agreement or obligation to the lawyer as to expenses or fees". More than $470,000 in unpaid bills, with the meter still running and poor prospects of future payment, is substantial by any reckoning.

Surprisingly, the district judge did not mention either Local Rule PRC 1.16(b)(1)(F) or Model Rule 1.16(b) when denying Cherry's motion. A law firm might promise its client not to take advantage of options under these rules, but the contract between Cherry and its clients did not restrict its ability to withdraw; to the contrary, it expressly entitles the firm to do so if fees are not paid. Instead of discussing either the rules or the contract, the district judge

denied the motion because, in her view, it had been filed too late.

A lawyer engaged in strategic conduct may forfeit any right to withdraw. One form of strategic behavior is waiting until the client is over a barrel and then springing a demand for payment (perhaps enhanced payment). This would be equivalent to the coercive tactics used by the seamen, and condemned by the court, in *Alaska Packers' Ass'n v. Domenico*, 117 F. 99 (9th Cir. 1902), which held that a promise to pay double wages, extracted after the ship was at sea, was unenforceable. See also, e.g., *Contempo Design, Inc. v. Chicago & Northeast Illinois District Council of Carpenters*, 226 F.3d 535 (7th Cir. 2000) (en banc) (a collective bargaining agreement signed during an unlawful strike at the height of demand for the employer's products is unenforceable). Avoiding such tactics is a point of the proviso in Model Rule 1.16(b)(5) that counsel must give "reasonable warning". The district judge did not doubt that warning had been given (a requirement at any event omitted from the Northern District's version of Rule 1.16); nor did she find that Cherry had its clients at its mercy. The firm did not seek to withdraw on the first day of trial, for example, but instead represented the INTIC parties through the end of discovery and sought to withdraw in a quiet period before trial. An effort to withdraw earlier— while discovery deadlines were looming—might have been thought opportunistic. Instead Cherry protected its clients' interests through discovery and sought to withdraw only when substitution of counsel would be relatively simple. It is hard to see why this forbearance, from which the clients received a substantial benefit, should compel Cherry to contribute unpaid services for the indefinite future.

Severe prejudice to third parties—who might have more to lose than the unpaid lawyer—is another potential ground for denying a motion to withdraw. This is not because Cherry owes any obligation to protect the interests of the

INTIC parties' *adversaries*; it is again a matter of timing, and a judge may insist that counsel resolve differences with clients in a fashion that curtails strangers' avoidable losses. The district judge hinted that there was some potential for prejudice. Yet none of the other litigants perceived any. Asked in open court whether Cherry's withdrawal would cause prejudice, each of the other parties gave a negative answer. That pattern has been repeated on appeal. We asked the other litigants to respond to Cherry's position; none suggested that its withdrawal would cause injury, though the plaintiff understandably opposes any delay in the trial's commencement, now scheduled for March 31, 2003. Whether delay would be prejudicial (as opposed to annoying) is open to question; prejudgment interest is available, and no one contends that the INTIC parties would use additional time to dispose of resources that could be used to satisfy any judgment. The value of their third-party claims remains available to other litigants that obtain judgments against the INTIC parties. Most likely, Cherry's withdrawal would leave the INTIC parties unrepresented, leading to default judgments against the three corporations (which can appear *only* by counsel). That would expedite rather than delay the conclusion of the case. It would injure the INTIC parties if they have good third-party claims, but in that event they should be able to secure a new lawyer, if necessary by offering a contingent fee to be paid out of third-party recoveries. At all events, we do not see how third parties stand to lose more if Cherry withdraws now than Cherry stands to lose if it must provide future services and bear out-of-pocket expenses that are unlikely to be compensated.

The district court's order denying Cherry's motion to withdraw was an abuse of discretion and is

REVERSED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*