*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-1296

FILED 07/27/2017
District of Columbia
Court of Appeals

*Julio Castillo*
Clerk of Court

ASSOCIATED ESTATES LLC, *et al.*, APPELLANTS,

V.

BANKATLANTIC, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-2344-06)

(Hon. John M. Mott, Trial Judge)

(Argued October 18, 2016                    Decided July 27, 2017)

*Yaida O. Ford* for appellants. *Thomas G. Corcoran Jr.*, *Melvin White*, and *Laina Lopez* were on the brief for appellants.

*David J. Ludlow*, with whom *Ryan C. Morris* and *Kristen A. Knapp* were on the brief, for appellees.

Before FISHER and THOMPSON, *Associate Judges*, and RUIZ, *Senior Judge*.

THOMPSON, *Associate Judge*:    Plaintiffs/appellants, Associated Estates, LLC, and its managing member and corporate representative, Barrett Ware, (together, "AE") contend that the trial court (the Honorable John M. Mott) erred and abused its discretion in enforcing a settlement between AE and

defendants/appellees BankAtlantic; Heartwood 88, LLC; Heartwood 87, LLC; Sunrise Atlantic, LLC; and Fidelity Tax, LLC (together, "BankAtlantic"). We affirm.

## I.

The parties had a contract under which AE performed research and portfolio-servicing work for BankAtlantic in connection with tax lien certificates. On March 24, 2006, AE filed a complaint against BankAtlantic, alleging breach-of-contract and other claims and seeking both equitable relief and damages in excess of $19 million. In February 2012, after nearly six years of discovery and motions practice, the parties participated in a private mediation before a retired Superior Court judge in an attempt to resolve the counts of the complaint that had survived a motion to dismiss. The private mediation was unsuccessful.

Thereafter, on February 17, 2012, Judge Mott held a case status conference for which Mr. Ware was not present. During the status conference, counsel for AE told Judge Mott that while the parties were "closer than . . . in the past," they had not been able to reach a settlement during the private mediation. Judge Mott asked whether the parties "[w]ant[ed] to let [him] know the amounts . . . ."

BankAtlantic's counsel responded that "[t]he last offers" were BankAtlantic's offer to settle the case for $1 million and AE's counter-demand of $1.8 million. AE's counsel acknowledged that those "dollar figures [we]re correct." Judge Mott then suggested a court-led settlement conference to be held on April 4, 2012.[1] Counsel for both parties agreed.

The April 4 settlement conference began with Judge Mott inquiring about the "latest demand from the plaintiffs." Counsel for AE responded that the dollar figures remained the same. Judge Mott then referred to the $800,000 "gulf," said that there appeared to be "a reasonable chance to settle this matter," and said that he would talk separately with each side, and with anyone they cared to bring along, in separate jury rooms (a format that Judge Mott later observed was a "standard procedure" that judges "are trained to employ"). No one objected.

After seven hours of negotiations, the parties reached an oral agreement to settle the lawsuit for $1.55 million. The judge and the parties and their respective counsel then returned to the courtroom to put the terms of the agreement on the record. After Judge Mott summarized his understanding of the agreement and

---

[1] No trial date had been set.

AE's counsel and BankAtlantic's counsel added details about the latter's agreement to prepare a first draft of a written agreement and agreed that the settlement payment would be made to the trust account of AE's counsel, Mr. Ware thanked the court. A moment later, however, in what he later described as an "outburst," Mr. Ware said, "You all screwed me. You all screwed me."[2] Judge Mott then announced a "short break" in the proceedings and suggested that Mr. Ware step into the hallway with his counsel. When AE's counsel returned without Mr. Ware, who, he told the court, was "upset," Judge Mott said that the proceedings were "really not done if [the court's] impression could potentially be that [Mr. Ware is] not entering into this voluntarily." Judge Mott added that he wanted to ask Mr. Ware whether he had entered into the settlement agreement voluntarily.

When it appeared that Mr. Ware might not return to the courtroom that day, Judge Mott suggested that AE's counsel "come in some time tomorrow [or "the next day"] with Mr. Ware, and just finalize things on the record." When appellant thereafter returned to the courtroom (after what Judge Mott observed had been "nearly twenty minutes"), Judge Mott inquired, "So, Mr. Ware, is this your

---

[2] In his order enforcing the settlement agreement, Judge Mott stated that Mr. Ware's outburst entailed "screaming at defense counsel."

agreement? Is this what you want at this point? It may not be exactly what you expected or wanted, initially, but is this what you want me to do today to approve this agreement and move on?" Judge Mott told Mr. Ware that he was "not going to approve" the agreement "unless the people that are involved on both sides feel it was a voluntary decision, that they weren't forced into this in any way," and "unless this is what you want. So it's not about what you said in the back. It's about what you want to say now." Judge Mott then added that Mr. Ware should "feel free" "to have another minute" and asked whether Mr. Ware wanted "to speak with your lawyers for just a second or do you want to tell me what you think?" Judge Mott also said that he had to "go in about five or ten minutes, to pick up my kids" but that "other than that, . . . I have time." Mr. Ware said that he would "talk to [his lawyers] for about 45 seconds or so." After a "[p]ause" in the proceedings, Mr. Ware told the court he would "take the settlement."

Several days after the settlement conference, BankAtlantic's counsel circulated a draft of the written settlement agreement, but Mr. Ware did not sign the agreement. On May 8, 2012, AE's counsel finally informed BankAtlantic's counsel that he was "unable to tell you if or when [Mr. Ware would] sign the settlement agreement." On May 15, 2012, BankAtlantic filed its motion to enforce the settlement agreement. AE, represented by new counsel, opposed

BankAtlantic's motion, attaching a declaration from Mr. Ware and arguing that the agreement should not be enforced because (1) the settlement conference was an improper *ex parte* communication, (2) counsel for both parties had improperly disclosed material confidences, (3) the court and AE's counsel had exerted undue influence, and (4) Mr. Ware "was not advised or informed that [AE] had the right to decline to engage in settlement discussions mediated by the trial judge."

On September 24, 2012, Judge Mott granted the motion to enforce the settlement agreement. On October 9, 2012, AE filed a "[m]otion for [r]econsideration" of the order enforcing the settlement agreement, relying on Superior Court Civil Rules 59 (e) and 60 (b). The motion was accompanied by a "Second Declaration" of Mr. Ware. AE also filed a motion asking the court to seal that Second Declaration and a motion and accompanying affidavit asking Judge Mott to recuse himself. Judge Mott denied those various requests on October 8, 2014. On November 6, 2014, AE filed a notice of appeal in which it designated, as the orders to be reviewed, the (1) denial of the motion to recuse; (2) denial of the motion to seal, and (3) denial of the motion for reconsideration. AE has abandoned its appeal from denial of the motion to seal, but argues that this court's review should reach the order granting the motion to enforce as well as the order denying reconsideration.

AE's primary contentions on appeal are that the trial court erred in granting the motion to enforce and abused its discretion in not setting aside the enforcement order because the agreement was the product of undue influence by AE's then-counsel and the result of a procedurally unconscionable process.

## II.

We begin by deciding what orders are before us for review. BankAtlantic argues that because AE's Notice of Appeal did not designate the order enforcing the settlement agreement as an order being appealed, we may review only the denial of the motion for reconsideration, as to which our review is for abuse of discretion.[3] AE contends that the effect of its timely Rule 59 (e) motion is that we may review both the denial of the motion for reconsideration and the judgment enforcing the settlement agreement, notwithstanding that the latter was not listed on the Notice of Appeal. We are satisfied that AE has the better of the argument.

---

[3] *See Dist. No. 1 — Pac. Coast Dist. v. Travelers Cas. & Sur. Co.*, 782 A.2d 269, 278 (D.C. 2001) ("Motions under either rule [59 (e) or 60 (b)] are committed to the broad discretion of the trial judge." (citations omitted)).

The rules of this court provide, just as they did at the time AE filed its Notice of Appeal, that a "notice of appeal must . . . designate the judgment, order, or part thereof being appealed." D.C. App. R. 3 (c)(1)(B). However, at the time AE filed its appeal, Rule 3 (c)(5), reflecting a 2004 amendment,[4] further provided in pertinent part that:

> Parties are encouraged to use Form 1 [which directs the appellant to enter the "[d]ate of entry of judgment or order appealed from"] . . . , though the use of a particular form is not required. Failure to provide any of the information requested on Form 1 . . . *except for the specification of the party or parties taking the appeal and the designation of the judgment or order, or part thereof being appealed*, will not deprive the court of jurisdiction to consider the appeal.

D.C. App. R. 3 (c)(5) (2014) (emphasis added). We said in *Vines* that notwithstanding our general "liberal construction" of Rule 3, the warning contained in subsection (c)(5) obliged us to limit our review to the orders designated in the appeal notice. *See* 935 A.2d at 1083. BankAtlantic relies on *Vines* in arguing that the order enforcing the settlement agreement is beyond the scope of our review. We disagree for the following reasons.

---

[4] *See Vines v. Manufacturers & Traders Tr. Co.*, 935 A.2d 1078, 1083 (D.C. 2007).

Effective November 30, 2016, i.e., during the pendency of this appeal, this court amended D.C. App. R. 3. The amended rule continues to require the notice of appeal to "designate the judgment, order, or part thereof being appealed," D.C. App. R. 3 (c)(1)(B), but omits the warning previously contained in subsection (c)(5). The Supreme Court has observed that "[c]hanges in procedural rules may often be applied in [matters] arising before their enactment without raising concerns about retroactivity." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 275 (1994); *see also id.* at 275 n.29 ("Our orders approving amendments to federal procedural rules reflect the commonsense notion that the applicability of such provisions ordinarily depends on the posture of the particular case." (citing Order Amending Federal Rules of Criminal Procedure, 495 U.S. 969 (1990) (amendments applicable to pending cases "insofar as just and practicable"); Order Amending Federal Rules of Civil Procedure, 456 U.S. 1015 (1982) (same); Order Amending Bankruptcy Rules and Forms, 421 U.S. 1021 (1975) (amendments applicable to pending cases "except to the extent that in the opinion of the court their application in a particular proceeding then pending would not be feasible or would work injustice")).

Even if Rule 3 (c)(5) is properly considered a jurisdictional rule,[5] "a presumption against retroactive application of new legislation [or rules] to pending cases . . . generally does not apply to rules conferring or withdrawing jurisdiction." *Arrowhead Estates Dev. Co. v. United States Tr.*, 42 F.3d 1306, 1311 (9th Cir. 1994) (holding that amendments to Rule 4 (a)(4) of the Federal Rules of Appellate Procedure that became effective after Arrowhead lodged its appeal did not preclude application of the amended rule to the case (citing *Landgraf*, 511 U.S. at 274 ("We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed.")).

We conclude that AE is entitled to the more liberal construction of Rule 3 that the 2016 amendments signaled. With the omission of the warning formerly contained in subsection 3 (c)(5), we are free to return to the approach set out in

---

[5] The Supreme Court has cautioned that the label "jurisdictional" should be reserved for "prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority," *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004). However, the Court also "ha[s] held that the dictates of Rule 3 of the Federal Rules of Appellate Procedure, including the requirement to 'designate the judgment, order, or part thereof being appealed, are 'jurisdictional in nature.'" *Gonzalez v. Thaler*, 565 U.S. 134, 147 (2012) (quoting *Smith v. Barry*, 502 U.S. 244, 248 (1992)); *see also Neill v. District of Columbia Pub. Emp. Relations Bd.*, 93 A.3d 229, 238 n.43 (D.C. 2014).

opinions of this court that pre-date the adoption of that warning language. *See, e.g., Perry v. Sera*, 623 A.2d 1210, 1214, 1215 (D.C. 1993) ("[W]e think that [Rule 3] should not be so stringently construed as to bar an appeal where, as here, it is clear from the face of the Notice of Appeal that appellant was seeking review of the underlying judgment dismissing her claim as well as the denial of the [m]otion for [r]econsideration"); *id.* (noting that "on the Notice of Appeal, appellant wrote . . . that she was appealing from the denial of the '[m]otion for [r]econsideration of [o]rder dismissing complaint'" but that "on the very next line[,] where appellant was to indicate the '[i]ssues to be presented by appellant on appeal,' she presented the exact issue that she wishes this court to address: 'whether trial court abused its discretion in dismissing complaint and denying [m]otion to reconsider his decision.'" (footnote omitted)); *see also Wallace v. Warehouse Emps. Union No. 730*, 482 A.2d 801, 810 n.26 (D.C. 1984) (holding, in an opinion issued before the designation requirement was added to Rule 3 in 1985,[6] that "[w]e may review both the ruling on the motion for summary judgment and the denial of the motion for reconsideration despite the fact that appellants' notice of appeal challenged only the denial of the motion for reconsideration." (citing *Coleman v. Lee Washington Hauling Co.*, 388 A.2d 44, 45 n.1 (D.C. 1978) ("Although the notice of appeal

---

[6] *See Perry*, 623 A.2d at 1215 n.13.

designated the order of May 24 rather than the order of May 10 as the order from which appeal was taken, the designation is not dispositive of our jurisdiction."))).

Here, although AE's Notice of Appeal does not contain language specifying the exact issues AE wanted this court to address, the order denying reconsideration attached to the Notice made clear that Judge Mott's principal rationale for denying reconsideration of the order enforcing the settlement agreement was that the court declined to "review its determination . . . based on arguments it previously addressed in the enforcement order . . . ." We think AE's appeal from that judgment by the court gave a fair indication that AE sought this court's review with respect to the trial court's "previously addressed" reasoning. Accordingly, we proceed to our analysis of both the order enforcing the settlement agreement and the order denying the motion for reconsideration.[7]

---

[7] We note, too, that the facts here are quite unlike those in *Vines*, in which the notice of appeal listed a May 30, 2006, order that granted summary judgment on statute-of-limitations grounds to a wrongful-foreclosure defendant, but failed to list an unrelated March 20, 2006, order that rejected Vines's plea-of-title claim and entered a judgment for possession in favor of a foreclosure-sale purchaser. *See* 935 A.2d at 1079–80, 1082. Nothing in this opinion should be taken to imply that we would apply the approach we apply here — reviewing the denial of the motion for reconsideration of the enforcement order as well as the underlying enforcement order, the time for appeal from which was stayed by the timely post-judgment motion — in a case where the issue is whether we may review a judgment or order(s) unrelated to the one(s) listed on the notice of appeal.

**III.**

Appellants first contend that Judge Mott erred in enforcing the settlement agreement despite Mr. Ware's averment in his (first) declaration that his agreement to settle was the result of undue influence by his attorneys.

A settlement agreement is a contract, and whether a contract is enforceable is a question of law, which we review *de novo*. *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009). "[T]he legal test of undue influence . . . is influence that destroys free agency." *Ross v. Blackwell*, 146 A.3d 385, 391 (D.C. 2016) (internal quotation marks and brackets omitted). Under some circumstances, evidence of undue influence may warrant setting aside a contract. *See Pierola v. Moschonas*, 687 A.2d 942, 950 (D.C. 1997) ("[C]ourts have . . . insisted on objective evidence of fraud, duress, overreaching, undue influence or mistake before setting aside allegedly unfair contracts."). And, "[i]t generally takes less to establish undue influence when a confidential relationship exists between the parties" to a contract. *Roberts-Douglas v. Meares*, 624 A.2d 405, 420 (D.C. 1992). However, it is far from clear that "alleged coercion by [a party's own] *counsel* . . . affect[s] the validity of [the party's] consent to [a] settlement." *Macktal v. Sec'y of Labor*, 923

F.2d 1150, 1157 (5th Cir. 1991) (emphasis added). For purposes of our analysis, we focus on the averred facts that AE argues show undue influence by its counsel, and we assume without deciding that undue influence by counsel would have been a valid basis for Judge Mott to refuse to withhold enforcement of the settlement agreement. "Undue influence is a mixed question of fact and law"; we review the pertinent factual findings for clear error and the legal issues *de novo*. *Ross*, 146 A.3d at 387 (quoting *In re Ingersoll Tr.*, 950 A.2d 672, 692 (D.C. 2008)).

We can find no error in Judge Mott's decision not to withhold enforcement of the settlement agreement on this basis, because AE's opposition to the motion to enforce asserted in only a conclusory (and circular) fashion that "it was improper for their prior counsel to unduly pressure [p]laintiffs regarding settlement." Mr. Ware's declaration supplied no more specificity, stating, without detail or supporting facts, that he was "under considerable pressure from [his] prior counsel to settle." Courts generally agree that "[t]he evidence to establish . . . undue influence must be clear, cogent, and convincing." *In re Estate of Smith*, 411 P.2d 879, 883 (Wash. 1966). Nothing in AE's opposition to the motion to enforce satisfied that standard.

In ruling on the motion for reconsideration, Judge Mott was presented with a more developed record. Mr. Ware's Second Declaration, attached in support of that motion, set out the following assertions with respect to AE's counsel and the broader context of AE's considerations about whether to settle[8]: As of February 2012, AE owed its counsel approximately $225,000, and counsel informed Mr. Ware "that [counsel] was at the end of the rope with his firm regarding [that] outstanding balance . . . ." Counsel had also advised Mr. Ware to the same effect by mid-January 2012 and told him that if AE did not pay the balance, the firm would have to withdraw from representation. Counsel further informed Mr. Ware in February 2012 that the result of the outstanding balance was that he had "the highest receivable in the firm" and that he and his associate had not received bonuses as a result. Counsel strongly urged AE to settle. Further, in a March 2, 2012, letter to Mr. Ware, counsel advised that unless the firm received full payment on or before April 4, 2012, or AE agreed to settle the case on the day of the scheduled (April 4) settlement conference, the firm would "have no alternative . . . but to move to withdraw [its] appearance and . . . advise [AE] to immediately

---

[8] AE's motion for reconsideration asserted that there were "facts uncovered since the filing of [AE's] [o]pposition [to BankAtlantic's motion to enforce the settlement agreement that] demonstrate that [AE's] former trial counsel egregiously" failed AE. However, as will be seen from the summary of the averments in Mr. Ware's Second Declaration set out in the text above, the facts on which AE's motion relied were known to Mr. Ware at the time AE filed its opposition to the motion to enforce.

retain new counsel." In addition, counsel advised that if AE insisted on requesting a continuance of the scheduled settlement conference, the law firm would relay that request to the court but would move to withdraw as counsel.

Mr. Ware further averred that in or around January 2012, he informed counsel that according to Mr. Ware's research, BB&T planned to acquire BankAtlantic, an acquisition that Mr. Ware believed would strengthen AE's bargaining position. BankAtlantic itself was in financial trouble, a factor that caused Mr. Ware to "seriously consider . . . a settlement in the range of $2 million to $3 million," as he feared that the FDIC might take over BankAtlantic's assets and diminish or extinguish AE's claims. Mr. Ware asked his counsel whether BB&T should be brought into the suit if the acquisition occurred. The attorneys told Mr. Ware that BB&T was a client of their firm. Around mid-March 2012, the media were reporting that BB&T's acquisition of BankAtlantic "was moving forward," and AE was "no longer concerned about BankAtlantic going into receivership." This meant, according to Mr. Ware, that "the only impediment to the case moving forward to trial" was the pressure from counsel to settle so that the

law firm's outstanding bills could be paid.[9]   Mr. Ware averred that he was expecting another pending lawsuit to conclude soon in AE's favor, and that he planned to use funds recovered through that litigation to pay the law firm's bills. He asked counsel to request a continuance of the court settlement conference for a few weeks so that the other litigation could be concluded successfully and also in the hope that BankAtlantic would produce accounting documents AE had requested.

On the evening before the settlement conference, Mr. Ware was informed that AE had won the other lawsuit and so advised counsel on the morning of the settlement conference, but counsel said that the "victory in the other case was irrelevant unless [AE] could get a check to him that day to pay the outstanding balance owed to" the law firm.  During the settlement conference, when Judge Mott was out of the room, counsel "renewed the[] threat to withdraw if [AE] did not agree to the settlement," a threat counsel repeated even after Mr. Ware's "outburst" before Judge Mott.

---

[9]   Mr. Ware averred that one reason why he did not want to settle was that BankAtlantic had not produced certain accounting documents requested in discovery that were necessary for AE to evaluate its settlement position.

AE argued in its motion for reconsideration that the foregoing "uncontroverted evidence" warranted Judge Mott's reversal of his decision to enforce the settlement agreement. More specifically, AE argued that the facts averred in Mr. Ware's Second Declaration (which BankAtlantic had no basis for disputing) showed that the conduct by AE's previous counsel was "*outrageously* in violation of counsel's duty" to act in AE's best interest. Mem. in Support of Mot. For Recons. at 8, Oct. 9, 2012, (quoting *Lynch v. Meridian Hill Studio Apts., Inc.*, 491 A.2d 515, 519 (D.C. 1985) (internal quotation marks omitted)). We cannot agree.

AE owed its counsel a large outstanding balance, and AE's counsel warned AE months in advance of the April 4 settlement conference — in January and February as well as in March of 2012 — that the firm would have to withdraw from representing AE if its fees were not paid.[10] In February, he told Mr. Ware

---

[10] Rule 1.16 (b)(3) of the District of Columbia Rules of Professional Conduct provides that "a lawyer may withdraw from representing a client if . . . [t]he client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled." D.C. Rules of Prof'l Conduct R. 1.16 (b)(3). Comment 8 to Rule 1.16 states more specifically that "[a] lawyer may withdraw if the client refuses to abide by the terms of an agreement . . . concerning the timely payment of the lawyer's fees." D.C. Rules of Prof'l Conduct R. 1.16 cmt. 8. We express no opinion on whether counsel's actions in this case comported with Rule 1.16.

that payment must be received on or before April 4 and that they would withdraw if payment was not made, or the case was not settled, on or before that date. By June 7, 2012, the date when AE filed its opposition to BankAtlantic's motion to enforce the settlement agreement, AE had retained new counsel, showing that it was able to find new counsel within a couple of months after the settlement conference. These facts persuade us that AE could have found new counsel to represent it in this litigation even if it had parted ways with its previous counsel before the settlement conference, and even if it had declined to settle during the settlement conference. Given that AE's previous counsel did not "wait[] until the client [was] over a barrel . . . [to spring] a demand for payment," *Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 310 F.3d 537, 540 (7th Cir. 2002), we can find no abuse of discretion in Judge Mott's determination that the allegations in Mr. Ware's Second Declaration "contain[ed] no . . . instances of 'outrageous' conduct" by AE's previous counsel that warranted reconsideration of the order enforcing the settlement agreement.[11] We see no reason to doubt that counsel's threat to withdraw was an influence on AE, but in light of the large outstanding fee balance, counsel's warning about withdrawal

---

[11] As Judge Mott emphasized, counsel's statements were "not made on the eve of trial where, as a consequence, the pressure to settle might be ratcheted to another level."

does not appear to have been "undue" or to have deprived AE of "free agency." *Ross*, 146 A.3d at 391.

AE further argues, for the first time in its brief on appeal, that the conduct by AE's counsel rendered the settlement agreement voidable by AE as a matter of law, under the authority of the Restatement (Second) of Contracts § 177 (Am. Law Inst. 1981) ("When Undue Influence Makes a Contract Voidable"). That section of the Restatement recognizes that a contract is voidable if there has been "unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare." *Id.* AE argues that, because of its relationship with its counsel, it was justified in assuming that counsel would not act in a manner inconsistent with AE's welfare, and asserts that it entered into the settlement at counsel's urging even though counsel's advice was not consistent with AE's welfare, entitling it to unwind the agreement.[12]

---

[12] BankAtlantic argues that because AE did not cite Restatement § 177 in its motions filed in the trial court, its argument based on it is waived and should not be considered by this court. We elect to consider the argument as a species of the undue influence argument AE did present to Judge Mott. *See Abdus-Price v. United States*, 873 A.2d 326, 332 n.7 (D.C. 2005) (explaining that "the principle that 'normally' an argument not raised in the trial court is waived on appeal is . . . one of discretion rather than jurisdiction" and that "parties on appeal 'are not

(continued…)

In analyzing this argument, we note first that there appears to be an absence of law, in this jurisdiction and elsewhere, to the effect that a party may rescind a settlement agreement on the basis of undue influence by the party's own attorney. *See Taylor v. Kaiser Found. Health Plan of the Nw.*, No. 3:11-cv-1551-ST, 2012 U.S. Dist. LEXIS 184796, at \*26 (D. Or. Nov. 7, 2012) ("Even assuming that Taylor was indeed subject to undue influence by her attorney and union representative, this does not permit her to rescind the Agreement."); *Crown Cork & Seal USA, Inc. v. Behurst*, No. 3:10-CV-251-HZ, 2012 U.S. Dist. LEXIS 4150, at \*27–28, \*30 (D. Or. Jan. 12, 2012) (acknowledging Oregon's adoption of Restatement § 177, but finding an absence of any Oregon law that undue influence by a party's attorney supports rescission of an agreement). But assuming without deciding that this court would adopt the principle that undue influence by a party's attorney can render a settlement agreement voidable (and not merely, for example, form the basis for a malpractice action),[13] we cannot agree that the criteria described in Restatement § 177 are satisfied on the record here.

---

(…continued)

limited to the precise arguments they made below' in support of their claims" (quoting *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992)).

[13] *Cf. Macktal*, 923 F.2d at 1157–58 (holding — in a case in which the plaintiff/client argued that his attorney's threat to withdraw from representing him,

(continued…)

To be sure, as a general matter, a client is "justified, by virtue of the attorney-client relation, in assuming that [counsel] w[ill] not act in a manner inconsistent with [its] welfare." *Lempert v. Singer*, 766 F. Supp. 1356, 1362 (D.V.I. 1991). But AE's counsel acted in a manner *consistent* with AE's welfare when counsel repeatedly informed Mr. Ware that counsel would withdraw if payment was not made and advised AE that it would need to act immediately to retain new counsel.[14] Counsel also offered to request a continuance of the settlement conference if they withdrew, which relieved some of the pressure Mr. Ware might have felt. Moreover, even if counsel's advice to settle was not exclusively for the benefit of AE, counsel's repeated statements about withdrawing if payment of the outstanding balance was not made or if the case was not settled

---

(…continued)
and to charge him $12,000 in fees, if he did not consent to a settlement, voided his consent — that trial court did not abuse its discretion in refusing to void the settlement or in reasoning that the client's right to seek new counsel and the availability of a direct action by the client against the attorney weighed in favor of a conclusion that the client should bear the risk of his attorney's alleged misconduct).

[14] Although AE cites to the statement in Comment 5 to D.C. Rules of Prof'l Conduct R. 1.5 that "a lawyer should not enter into an agreement whereby services are to be provided only up to a stated amount when it is foreseeable that more extensive services probably will be required," this case does not appear to implicate that principle.

on April 4 put AE on notice that counsel were acting at least in part based on their own financial interest. Further, by Mr. Ware's own admission, counsel also told him that the law firm represented BB&T. Even if counsel did not characterize that fact or the attorneys' financial interests as creating (potential) conflicts of interest that would make it difficult for counsel to act fully in AE's interest, we think it had to be apparent to Mr. Ware (who, Judge Mott found, is a savvy business man) that, at the very least, counsel might be reluctant to take action adverse to BB&T or reluctant to continue the litigation, for reasons that had nothing to do with AE's welfare. Thus, the facts as alleged by AE do not support a conclusion that AE was "justified in assuming" that its counsel was solely focused on AE's welfare when counsel urged AE to settle.[15]

In addition, the record contains an April 6, 2012, email from Mr. Ware to counsel for BankAtlantic in which Mr. Ware stated that "[m]ore than anything [he] wanted to go to trial[,]" but that the assets in his "war chest" had become "tied up" due to "the narrowest twist of fate." This email seems to indicate that AE's

---

[15] In light of that conclusion, we need not discuss the parties' arguments with respect to § 177's proviso that a contract procured by the undue influence of a non-party is voidable only if the party seeking to enforce the contract "g[ave] value or relie[d] materially on the transaction" "without reason to know of the undue influence . . . ." Restatement (Second) of Contracts § 177 (3) (Am. Law Inst. 1981).

decision to settle rather than continue to litigate was due to circumstances other than judgment impaired by undue pressure from AE's previous counsel. *Cf. id.* at 1362–63 (concluding that client Lempert had not raised a genuine issue about whether the "free and competent exercise of her judgment" was impaired because the evidence was that "[s]he did not blindly trust [counsel], but insisted that she did not want to execute the power of attorney" and that it was "[o]nly when she became aware of the extent of her stepfather's illness [that] she cho[se] to execute the power of attorney").

For all the foregoing reasons, we cannot conclude that it was an abuse of discretion for Judge Mott, presented with the record before him about previous counsel's conduct, to conclude that the order enforcing the settlement agreement should stand.

## IV.

AE's additional argument is that it was error for Judge Mott to enforce the settlement agreement, and an abuse of discretion not to reconsider his enforcement order, because the agreement was the result of a procedurally unconscionable process. AE asserts that the process was unfair because (1) Judge Mott conducted

*ex parte* communications with the parties during the settlement conference without having received AE's affirmative consent; (2) Judge Mott and counsel for the parties discussed confidential information from the private mediation; (3) AE's counsel threatened to withdraw on the day of settlement negotiations if AE did not agree to settle; and (4) the judge pressured AE to accept the offer within five or ten minutes.

Under our case law, unless a contract is shown to be substantively unconscionable, it will not be rendered unenforceable because of procedural unconscionability, except "in an egregious situation." *Urban Invs., Inc. v. Branham*, 464 A.2d 93, 99 (D.C. 1983) (internal quotation marks omitted). That is because, "[w]ithout proof that the terms [of the contract] are unfair, the court normally will be unable to ascertain what detriment the weaker party suffered as a result of [an unconscionable] bargaining process." *Id.* at 100. To determine whether a contract is procedurally unconscionable or, in other words, whether the party seeking to void the contract lacked a "meaningful choice," we generally look to "all the circumstances surrounding the transaction," including the parties' "bargaining power," whether the parties had "a reasonable opportunity to understand" contract terms, "the manner in which the contract was entered" into, the relative expertise of the parties, and the timeframe in which the contract was

completed. *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 450–51 (D.C. Cir. 1965); *see also Urban Invs., Inc.*, 464 A.2d at 99.

Here, AE has not attempted to show that the settlement agreement was substantively unconscionable. Accordingly, for us to conclude that Judge Mott erred or abused his discretion in allowing the settlement agreement to stand, the record must establish that the procedural faults AE decries were "egregious." We cannot reach that conclusion.

Under an exception to Rule 2.9 of the District of Columbia Code of Judicial Conduct (the "Code"), which generally prohibits a judge from engaging in *ex parte* communications, "[a] judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to settle matters pending before the judge." D.C. Code of Judicial Conduct R. 2.9 (A)(4). Judge Mott observed that "[n]either side voiced or, even, indicated any objection" to the *ex parte* format and reasoned that AE's failure to object and participation operated as its implied consent. We can agree with AE that the preferable course might have been for Judge Mott to obtain explicit consent from each side's representative to conduct the settlement conference through *ex parte* communications with the other side, but it was not unreasonable for Judge Mott to infer that AE (which, he observed,

"appeared to entirely welcome the court's participation") consented to the procedure. Moreover, as Judge Mott reasoned, even if Mr. Ware acquiesced in the *ex parte* discussions because he believed he had no choice but to do so, that "did not require him to reach an actual settlement." And although AE argued in its motion for reconsideration that with a non-*ex parte* format, the "likely outcome [of the settlement conference] would have been radically different," it did not explain, and has not suggested on appeal, why a format in which the court met with the parties all together would have led to such a difference. Notably, in his April 6, 2012, email to counsel for BankAtlantic, Mr. Ware explained that his "outburst" on April 4 had not been directed at BankAtlantic or its counsel, suggesting that his view was not that BankAtlantic had used its *ex parte* discussions with Judge Mott to "screw" AE. Thus, the facts of the case do not support a conclusion that the *ex parte* nature of the settlement conference was an egregious situation that rendered the process unconscionable.

The record does not establish the precise scope of the private mediator's direction that "the mediation would be confidential," and, in its opposition to the motion to enforce the settlement agreement, AE cited as authority for its position only language from the General Mediation Order used in the Superior Court Multi-Door Dispute Resolution Division (contained in the Appendix of Forms to the

Superior Court's Rules of Civil Procedure).[16]  It is far from clear that the Superior Court Multi-Door form governed the private mediation.  It is also far from clear that references to previous settlement-offer amounts in the context of further settlement discussions at the court-led conference (which, AE has argued, "functioned . . . like a second day of mediation") violated the private-mediation directive.[17]  In any event, the respective lawyers knew each other's positions, and AE has not shown how the disclosure was a detriment to it in its settlement-conference negotiations.  Mr. Ware's Second Declaration explains that he told Judge Mott during the settlement discussions that the circumstances, and hence AE's position, had changed from the time of the private mediation "because BB&T's acquisition of BankAtlantic was now going forward . . . and BankAtlantic was in a position to pay the true amount of damages, not the low ball number."

---

[16]  *See* Form 117, Super. Ct. Civ. R. Appendix of Forms ("Both mediation and neutral case evaluation sessions are confidential . . . .  All proceedings at the mediation or case evaluation conference, including any statement made by any party, attorney or other participant, are privileged.  They may not be construed as an admission against interest and nothing said at such sessions may be used in court in connection with the case or any other litigation.").

[17]  AE does not dispute Judge Mott's statement that he "never asked the parties about details of the private mediation or what factors had led to the monetary figures" the parties had articulated.  Further, this matter does not involve the trial court's "'use [of] the information provided in settlement [communications] for the purpose of determining what is an appropriate resolution of a matter'" or "'to prove or disprove the validity or amount of a disputed claim.'"  *Sibley v. St. Albans Sch.*, 134 A.3d 789, 817 (D.C. 2016) (quoting *Lively v. Flexible Packaging Ass'n*, 930 A.2d 984, 994 (D.C. 2007) and Fed. R. Evid. 408 (a)(2)).

Mr. Ware did not aver, and AE does not claim, that Judge Mott nevertheless held AE to the $1.8 million counter-demand AE had made two months earlier (and, in his order enforcing the settlement agreement, Judge Mott stated that Mr. Ware was "at all times, free to seek a figure higher than the one he at one time demanded"). Accordingly, we have no basis for concluding that disclosure of the settlement offer amounts resulted in a process that was, as AE asserts, "egregiously tainted."

For the reasons already discussed, on the facts of this case we also cannot agree that AE's previous counsel's statements about withdrawing on the day of settlement negotiations if AE did not pay the outstanding fees or agree to settle rendered the process unconscionable. Moreover, Mr. Ware was not under the domination of these counsel, as he was also accompanied at the settlement conference by AE's outside general counsel, who, Judge Mott found, was "in the jury room with [Mr. Ware] throughout the settlement conference." We are satisfied that AE did not lack a meaningful choice with respect to whether to agree to settlement. We also discern no clear error in Judge Mott's finding that Mr. Ware's agreement to accept the settlement was voluntary.

Finally, the record does not support AE's claim that Judge Mott pressured AE to accept the offer within "five or ten minutes." AE does not dispute that it

agreed to settle only after a seven-hour negotiation, and it does not claim that it lacked enough time to understand the terms of settlement. And although Judge Mott referred to his need to leave the courthouse in five or ten minutes, his remarks on the record indicated that he was prepared to carry the matter over for a day or two to see whether Mr. Ware would accept the negotiated agreement; that the parties "could have a trial to see how the dust settles"; and that the judge would not approve the agreement if he was not satisfied that Mr. Ware was affirming it voluntarily. Again, we cannot conclude that the process was so "egregious" as to be unconscionable, and we therefore find no error or abuse of discretion in Judge Mott's rulings upholding the settlement agreement.

## V.

Lastly, AE argues that Judge Mott abused his discretion in declining to recuse himself. It asks us to "order Judge Mott recused from this case going forward" if we agree that the settlement agreement should not have been enforced. Because we uphold the orders enforcing the settlement agreement and denying reconsideration, we need not address the recusal issue.

**

For all the foregoing reasons, the judgments of the trial court are

*Affirmed.*